772 So.2d 1243 (2000)
Albert GORE, Jr., and Joseph I. Lieberman, Appellants,
v.
Katherine HARRIS, as Secretary, etc., et al., Appellees.
No. SC00-2431.
Supreme Court of Florida.
December 8, 2000.
*1246 John D.C. Newton, II of Berger Davis & Singerman, Tallahassee, Florida; Mitchell W. Berger of Berger Davis & Singerman, Fort Lauderdale, Florida; W. Dexter Douglass of the Douglass Law Firm, Tallahassee, Florida; David Boies of Boies, Schiller & Flexner, LLP, Armonk, New York; Ronald A. Klain and Andrew J. Pincus, c/o Gore/Lieberman Recount, Washington D.C.; Jeffrey D. Robinson of Baach, Robinson & Lewis, Washington, D.C.; Joseph E. Sandler of Sandler & Rieff, P.C., Washington, D.C.; Mark R. Steinberg, Los Angeles, California; John J. Corrigan, Jr., Boston, Massachusetts; Dennis Newman, Reading, Massachusetts; Kendall Coffey, Miami, Florida; Benedict E. Kuehne, Miami, Florida; and Theresa Wynn Roseborough, Atlanta, Georgia, for Albert Gore, Jr. and Joseph I. Lieberman, Appellants.
Deborah K. Kearney, General Counsel, and Kerey Carpenter, Assistant General Counsel, Florida Department of State, Tallahassee, Florida; and Joseph P. Klock, Jr., John W. Little, III, Alvin F. Lindsay III, Robert W. Pittman, Gabriel E. Nieto, Walter J. Harvey, and Ricardo M. Martinez-Cid of Steel, Hector & Davis, LLP, Tallahassee, Florida, for the Secretary of State and the Elections Canvassing Commission; Robert A. Ginsburg, Miami-Dade County Attorney, Murray A. Greenberg, First Assistant County Attorney, and Lee Kraftchick, Thomas A. Tucker Ronzetti, and Jeffrey P. Ehrlich, Assistant County Attorneys, Miami, Florida, for Miami-Dade County Canvassing Board, Lawrence D. King, Myriam Lehr, and David C. Leahy; Michael S. Mullin, Fernandina Beach, Florida, for Nassau County Canvassing Board, and Judge Robert E. Williams, Supervisor of Elections, Shirley N. King, Marianne P. Marshall, and David Howard; Leonard Berger and Andrew McMahon, Palm Beach County, West Palm Beach, Florida, for Charles Burton, Carol Roberts, and Theresa Lepore, Palm Beach County Canvassing Board, and Bruce Rogow and Beverly A. Pohl, Fort Lauderdale, Florida, and Robert M. Montgomery, Jr., West Palm Beach, Florida, for Theresa Lepore, Supervisor of Elections; and Barry Richard of Greenberg, Traurig, P.A., Tallahassee, Florida, Benjamin L. Ginsberg of Patton, Boggs, LLP, Washington, D.C., George J. Terwilliger, III, and Timothy E. Flanigan of White & Case, LLP, Washington, D.C., and Kirk Van Tine of Baker Botts, LLP, Washington, D.C., for George W. Bush and Dick Cheney, Appellees.
Gary L. Printy of the Law Office of Gary L. Printy, Tallahassee, Florida, for Stephen Cruce, Teresa Cruce, Terry Kelly, and Jeanette K. Seymour, Intervenors.
Terrell C. Madigan, Harold R. Mardenborough, Jr., and Christopher Barkas of McFarlain, Wiley, Cassedy & Jones, P.A., *1247 Tallahassee, Florida, for Matt Butler, Intervenor.
W. Robert Vezina, III and Frederick J. Springer of Vezina, Lawrence & Piscitelli, P.A., Tallahassee, Florida, for John E. Thrasher, Intervenor.
William Kemper Jennings, DeFuniak Springs, Florida, for Glenda Carr, Lonnette Harrell, Terry Richardson, Gary H. Shuler, Keith Temple, and Mark A. Thomas, Intervenors.
PER CURIAM.
We have for review a final judgment of a Leon County trial court certified by the First District Court of Appeal as being of great public importance and requiring immediate resolution by this Court. We have jurisdiction. See art. V, § 3(b)(5), Fla. Const.[1] The final judgment under review denies all relief requested by appellants Albert Gore, Jr. and Joseph I. Lieberman, the Democratic candidates for President and Vice President of the United States, in their complaint contesting the certification of the state results in the November 7, 2000, presidential election.[2] Although we find that the appellants are entitled to reversal in part of the trial court's order and are entitled to a manual count of the Miami-Dade County undervote, we agree with the appellees that the ultimate relief would require a counting of the legal votes contained within the undervotes in all counties where the undervote has not been subjected to a manual tabulation. Accordingly, we reverse and remand for proceedings consistent with this opinion.

I. BACKGROUND
On November 26, 2000, the Florida Elections Canvassing Commission (Canvassing Commission) certified the results of the election and declared Governor George W. Bush and Richard Cheney, the Republican candidates for President and Vice President, the winner of Florida's electoral votes.[3] The November 26, 2000, certified results showed a 537-vote margin in favor of Bush.[4]
On November 27, pursuant to the legislatively enacted "contest" provisions, Gore filed a complaint in Leon County Circuit Court contesting the certification on the grounds that the results certified by the Canvassing Commission included "a number of illegal votes" and failed to include "a number of legal votes sufficient to change or place in doubt the result of the election."[5]
Pursuant to the legislative scheme providing for an "immediate hearing" in a contest action, the trial court held a two-day evidentiary hearing on December 2 and 3, 2000, and on December 4, 2000, made an oral statement in open court denying all relief and entered a final judgment adopting the oral statement. The trial court did not make any findings as to the factual allegations made in the complaint and did not reference any of the testimony adduced in the two-day evidentiary hearing, other than to summarily state that the plaintiffs failed to meet their burden of proof. Gore appealed to the First District Court of Appeal, which certified the judgment to this Court.
The appellants' election contest is based on five instances where the official results certified involved either the rejection of a number of legal votes or the receipt of a number of illegal votes. These five instances, as summarized by the appellants' brief, are as follows:

*1248 (1) The rejection of 215 net votes for Gore identified in a manual count by the Palm Beach Canvassing Board as reflecting the clear intent of the voters;
(2) The rejection of 168 net votes for Gore, identified in the partial recount by the Miami-Dade County Canvassing Board.
(3) The receipt and certification after Thanksgiving of the election night returns from Nassau County, instead of the statutorily mandated machine recount tabulation, in violation of section 102.14, Florida Statutes, resulting in an additional 51 net votes for Bush.
(4) The rejection of an additional 3300 votes in Palm Beach County, most of which Democrat observers identified as votes for Gore but which were not included in the Canvassing Board's certified results; and
(5) The refusal to review approximately 9000 Miami-Dade ballots, which the counting machine registered as non-votes and which have never been manually reviewed.
For the reasons stated in this opinion, we find that the trial court erred as a matter of law in not including (1) the 215 net votes for Gore identified by the Palm Beach County Canvassing Board[6] and (2) in not including the 168 net votes for Gore identified in a partial recount by the Miami-Dade County Canvassing Board. However, we find no error in the trial court's findings, which are mixed questions of law and fact, concerning (3) the Nassau County Canvassing Board and the (4) additional 3300 votes in Palm Beach County that the Canvassing Board did not find to be legal votes. Lastly, we find the trial court erred as a matter of law in (5) refusing to examine the approximately 9000 additional Miami-Dade ballots placed in evidence, which have never been examined manually.

II. APPLICABLE LAW
Article II, section I, clause 2 of the United States Constitution grants to each state the authority to select presidential electors "in such Manner as the Legislature thereof may direct." The Legislature of this State has placed the decision for election of President of the United States, as well as every other elected office, in the citizens of this State through a statutory scheme. These statutes established by the Legislature govern our decision today. We consider these statutes cognizant of the federal grant of authority derived from the United States Constitution and derived from 3 U.S.C. § 5 (1994), entitled "Determination of controversy as to appointment of electors." That section provides:
If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.
(Emphasis supplied.)
This case today is controlled by the language set forth by the Legislature in section 102.168, Florida Statutes (2000). Indeed, an important part of the statutory election scheme is the State's provision for a contest process, section 102.168, which laws were enacted by the Legislature prior *1249 to the 2000 election.[7] Although courts are, and should be, reluctant to interject themselves in essentially political controversies, the Legislature has directed in section 102.168 that an election contest shall be resolved in a judicial forum. See § 102.168 (providing that election contests not pertaining to either house of the Legislature may be contested "in the circuit court"). This Court has recognized that the purpose of the election contest statute is "to afford a simple and speedy means of contesting election to stated offices." Farmer v. Carson, 110 Fla. 245, 251, 148 So. 557, 559 (1933).
In carefully construing the contest statute, no single statutory provision will be construed in such a way as to render meaningless or absurd any other statutory provision. See Amente v. Newman, 653 So.2d 1030, 1032 (Fla.1995). In interpreting the various statutory components of the State's election process, then, a common-sense approach is required, so that the purpose of the statute is to give effect to the legislative directions ensuring that the right to vote will not be frustrated. Cf. Firestone v. News-Press Pub. Co., 538 So.2d 457, 460 (Fla.1989) (approving common-sense implementation of valid portion of section 101.121, Florida Statutes (1985)which broadly read, in pertinent part, that "no person who is not in line to vote may come [into] any polling place from the opening to the closing of the polls, except the officially designated watchers, the inspectors, the clerks of election, *1250 and the supervisor of elections or his deputy"so as not to exclude persons accompanying aged or infirm voters, children of voting parents, doctors entering the building to treat voters needing emergency care, or persons bringing food or beverages to the election workers because such activities are recognized as "incidental to the voting process and ... sometimes necessary to facilitate someone else's ability to vote").
Section 102.168(2) sets forth the procedures that must be followed in a contest proceeding, providing that the contestant file a complaint in the circuit court within ten days after certification of the election returns or five days after certification following a protest pursuant to section 102.166(1), Florida Statutes (2000), whichever occurs later. Section 102.168(3) outlines the grounds for contesting an election, and includes: "Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election." § 102.168(3)(c) (emphasis added). Finally, section 102.168(8) authorizes the circuit court judge to "fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined, or checked, to prevent or correct any alleged wrong, and to provide any relief appropriate under the circumstances." (Emphasis added.)
The Legislature substantially revised section 102.168 in 1999.[8] That amendment preserved existing rights of unsuccessful candidates and made important additional changes to strengthen the protections provided to unsuccessful candidates in a contest action to be determined.[9] *1251 Moreover, rather than restraining the actions of the trial court hearing the contest, the legislative amendment codified the grounds for contesting an election, entitled any candidate or elector to an immediate hearing and provided the circuit judge with express authority to fashion such orders as are necessary to ensure that each allegation in the complaint is investigated, examined or checked. See Fla. H.R. Comm. on Election Reform, HB 281 (1999) Staff Analysis (February 3, 1999).
Although the right to contest an election is created by statute, it has been a long-standing right since 1845 when the first election contest statute was enacted. See ch. 38, art. 10, §§ 7-9, Laws of Fla. (1845). As is well established in this State by our contest statute, "[t]he right to a correct count of the ballots in an election is a substantial right which it is the privilege of every candidate for office to insist on, in every case where there has been a failure to make a proper count, call, tally, or return of the votes as required by law, and this fact has been duly established as the basis for granting such relief." State ex rel. Millinor v. Smith, 107 Fla. 134, 139, 144 So. 333, 335 (1932) (emphasis added). The Staff Analysis of the 1999 legislative amendment expressly endorses this important principle. Similarly, the Florida House of Representatives Committee on Election Reform 1997 Interim Project on Election Contests and Recounts expressly declared:
Recounts are an integral part of the election process. For one's vote, when cast, to be translated into a true message, that vote must be accurately counted, and if necessary, recounted. The moment an individual's vote becomes subject to error in the vote tabulation process, the easier it is for that vote to be diluted.
Furthermore, with voting statistics tracing a decline in voter turnout and in increase in public skepticism, every effort should be made to ensure the integrity of the electoral process.
Integrity is particularly crucial at the tabulation stage because many elections occur in extremely competitive jurisdictions, where very close election results are always possible. In addition, voters and the media expect rapid and accurate tabulation of election returns, regardless of whether the election is close or one sided. Nonetheless, when large numbers of votes are to be counted, it can be *1252 expected that some error will occur in tabulation or in canvassing.
Id. at 15 (footnotes omitted). It is with the recognition of these legislative realities and abiding principles that we address whether the trial court made errors of law in rendering its decision.

III. ORDER ON REVIEW
Vice President Gore claims that the trial court erred in the following three ways: (1) The trial court held that an election contest proceeding was essentially an appellate proceeding where the County Canvassing Board's decision must be reviewed with an "abuse of discretion," rather than "de novo," standard of review; (2) The court held that in a contest proceeding in a statewide election a court must review all the ballots cast throughout the state, not just the contested ballots; (3) The court failed to apply the legal standard for relief expressly set forth in section 102.168(3)(c).

A. The Trial Court's Standard of Review

The Florida Election Code sets forth a two-pronged system for challenging vote returns and election procedures. The "protest" and "contest" provisions are distinct proceedings. A protest proceeding is filed with the County Canvassing Board and addresses the validity of the vote returns. The relief that may be granted includes a manual recount. The Canvassing Board is a neutral ministerial body. See Morse v. Dade County Canvassing Board, 456 So.2d 1314 (Fla. 3d DCA 1984). A contest proceeding, on the other hand, is filed in circuit court and addresses the validity of the election itself. Relief that may be granted is varied and can be extensive. No appellate relationship exists between a "protest" and a "contest"; a protest is not a prerequisite for a contest. Cf. Flack v. Carter, 392 So.2d 37 (Fla. 1st DCA 1980) (holding that an election protest under section 102.166 was not a condition precedent to an election contest under section 102.168). Moreover, the trial court in the contest action does not sit as an appellate court over the decisions of the Canvassing Board. Accordingly, while the Board's actions concerning the elections process may constitute evidence in a contest proceeding, the Board's decisions are not to be accorded the highly deferential "abuse of discretion" standard of review during a contest proceeding.
In the present case, the trial court erroneously applied an appellate abuse of discretion standard to the Boards' decisions. The trial court's oral order reads in relevant part:
The local boards have been given broad discretion which no Court may overrule, absent a clear abuse of discretion.
Gore v. Harris, No. 00-2808, 2000 WL 1770257 (Fla.2d Cir.Ct. Dec. 4, 2000) (Proceedings at 10). The trial court further noted: "The court further finds that the Dade Canvassing Board did not abuse its discretion.... The Palm Beach County Board did not abuse its discretion in its review and recounting process."[10] In applying the abuse of discretion standard of review to the Boards' actions, the trial court relinquished an improper degree of its own authority to the Boards. This was error.

B. Must all the Ballots be Counted Statewide?

Appellees contend that even if a count of the undervotes in Miami-Dade were appropriate, section 102.168, Florida Statutes (2000), requires a count of all votes in Miami-Dade County and the entire state as opposed to a selected number of votes challenged. However, the plain language of section 102.168 refutes appellees' argument.
Section 102.168(2) sets forth the procedures that must be followed in a contest proceeding, providing that the contestant file a complaint in the circuit court within *1253 ten days after certification of the election returns or five days after certification following a protest pursuant to section 102.166(1), whichever occurs later. Section 102.168(3) outlines the grounds for contesting an election, and includes: "Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election." § 102.168(3)(c) (emphasis added). Finally, section 102.168(8) authorizes the circuit court judge to "fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined, or checked, to prevent or correct any alleged wrong, and to provide any relief appropriate under the circumstances."
As explained above, section 102.168(3)(c) explicitly contemplates contests based upon a "rejection of a number of legal votes sufficient to change the outcome of an election." Logic dictates that to bring a challenge based upon the rejection of a specific number of legal votes under section 102.168(3)(c), the contestant must establish the "number of legal votes" which the county canvassing board failed to count. This number, therefore, under the plain language of the statute, is limited to the votes identified and challenged under section 102.168(3)(c), rather than the entire county. Moreover, counting uncontested votes in a contest would be irrelevant to a determination of whether certain uncounted votes constitute legal votes that have been rejected. On the other hand, a consideration of "legal votes" contained in the category of "undervotes" identified statewide may be properly considered as evidence in the contest proceedings and, more importantly, in fashioning any relief.
We do agree, however, that it is absolutely essential in this proceeding and to any final decision, that a manual recount be conducted for all legal votes in this State, not only in Miami-Dade County, but in all Florida counties where there was an undervote and, hence, a concern that not every citizen's vote was counted. This election should be determined by a careful examination of the votes of Florida's citizens and not by strategies extraneous to the voting process. This essential principle, that the outcome of elections be determined by the will of the voters, forms the foundation of the election code enacted by the Florida Legislature and has been consistently applied by this Court in resolving elections disputes.
We are dealing with the essence of the structure of our democratic society; with the interrelationship, within that framework, between the United States Constitution and the statutory scheme established pursuant to that authority by the Florida Legislature. Pursuant to the authority extended by the United States Constitution, in section 103.011, Florida Statutes (2000), the Legislature has expressly vested in the citizens of the State of Florida the right to select the electors for President and Vice President of the United States:
Electors of President and Vice President, known as presidential electors, shall be elected on the first Tuesday after the first Monday in November of each year the number of which is a multiple of 4. Votes cast for the actual candidates for President and Vice President shall be counted as votes cast for the presidential electors supporting such candidates. The Department of State shall certify as elected the presidential electors of the candidates for President and Vice President who receive the highest number of votes.
Id. In so doing, the Legislature has placed the election of presidential electors squarely in the hands of Florida's voters under the general election laws of Florida.[11] *1254 Hence, the Legislature has expressly recognized the will of the people of Florida as the guiding principle for the selection of all elected officials in the State of Florida, whether they be county commissioners or presidential electors.
When an election contest is filed under section 102.168, Florida Statutes (2000), the contest statute charges the trial judge to:
fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined, or checked, to prevent or correct any alleged wrong, and to provide any relief appropriate under such circumstances.
Id. (emphasis added). Through this statute, the Legislature has granted trial courts broad authority to resolve election disputes and fashion appropriate relief. In turn, this Court, consistent with legislative policy, has pointed to the "will of the voters" as the primary guiding principle to be utilized by trial courts in resolving election contests:
[T]he real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interests to that of the people. Ours is a government of, by and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard.

Boardman v. Esteva, 323 So.2d 259, 263 (Fla.1975) (emphasis added). For example, the Legislature has mandated that no vote shall be ignored "if there is a clear indication of the intent of the voter" on the ballot, unless it is "impossible to determine the elector's choice." § 101.5614(5)-(6) Fla. Stat. (2000). Section 102.166(7), Florida Statutes (2000), also provides that the focus of any manual examination of a ballot shall be to determine the voter's intent. The clear message from this legislative policy is that every citizen's vote be counted whenever possible, whether in an election for a local commissioner or an election for President of the United States.[12]
The demonstrated problem of not counting legal votes inures to any county utilizing a counting system which results in undervotes and "no registered vote" ballots. In a countywide election, one would not simply examine such categories of ballots from a single precinct to ensure the reliability and integrity of the countywide vote. Similarly, in this statewide election, review should not be limited to less than all counties whose tabulation has resulted in such categories of ballots. Relief would not be "appropriate under [the] circumstances" if it failed to address the "otherwise valid exercise of the right of a citizen to vote" of all those citizens of this State *1255 who, being similarly situated, have had their legal votes rejected. This is particularly important in a presidential election, which implicates both state and uniquely important national interests. The contestant here satisfied the threshold requirement by demonstrating that, upon consideration of the thousands of undervote or "no registered vote" ballots presented, the number of legal votes therein were sufficient to at least place in doubt the result of the election. However, a final decision as to the result of the statewide election should only be determined upon consideration of the legal votes contained within the undervote or "no registered vote" ballots of all Florida counties, as well as the legal votes already tabulated.

C. The Plaintiff's Burden of Proof

It is immediately apparent, in reviewing the trial court's ruling here, that the trial court failed to apply the statutory standard and instead applied an improper standard in determining the contestant's burden under the contest statute. The trial court began its analysis by stating:
[I]t is well established and reflected in the opinion of Judge Joanos and Smith v. Tine[[13]][sic], that in order to contest election results under Section 102.168 of the Florida Statutes, the Plaintiff must show that, but for the irregularity, or inaccuracy claimed, the result of the election would have been different, and he or she would have been the winner.
It is not enough to show a reasonable possibility that election results could have been altered by such irregularities, or inaccuracies, rather, a reasonable probability that the results of the election would have been changed must be shown.
In this case, there is no credible statistical evidence, and no other competent substantial evidence to establish by a preponderance of a reasonable probability that the results of the statewide election in the State of Florida would be different from the result which has been certified by the State Elections Canvassing Commission.
This analysis overlooks and fails to recognize the specific and material changes to the statute which the Legislature made in 1999 that control these proceedings. While the earlier version, like the current version, provided that a contestant shall file a complaint setting forth "the grounds on which the contestant intends to establish his or her right to such office or set aside the result of the election," the prior version did not specifically enumerate the "grounds for contesting an election under this section." Those grounds, as contained in the 1999 statute, now explicitly include, in subsection (c), the "[r]eceipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election." (Emphasis supplied.) Assuming that reasonableness is an implied component of such a doubt standard,[14] the determination of whether the plaintiff has met his or her burden of proof to establish that the result of an election is in doubt is a far different standard than the "reasonable probability" standard, which was applicable to contests under the old version of the statute, and erroneously applied and articulated as a "preponderance of a reasonable probability" standard *1256 by the trial court here. A person authorized to contest an election is required to demonstrate that there have been legal votes cast in the election that have not been counted (here characterized as "undervotes" or "no vote registered" ballots) and that available data[15] shows that a number of legal votes would be recovered from the entire pool of the subject ballots which, if cast for the unsuccessful candidate, would change or place in doubt the result of the election. Here, there has been an undisputed showing of the existence of some 9000 "undervotes" in an election contest decided by a margin measured in the hundreds. Thus, a threshold contest showing that the result of an election has been placed in doubt, warranting a manual count of all undervotes or "no vote registered" ballots, has been made.

LEGAL VOTES
Having first identified the proper standard of review, we turn now to the allegations of the complaint filed in this election contest. To test the sufficiency of those allegations and the proof, it is essential to understand what, under Florida law, may constitute a "legal vote," and what constitutes rejection of such vote.
Section 101.5614(5), Florida Statutes (2000), provides that "[n]o vote shall be declared invalid or void if there is a clear indication of the intent of the voter as determined by the canvassing board." Section 101.5614(6) provides, conversely, that any vote in which the board cannot discern the intent of the voter must be discarded. Lastly, section 102.166(7)(b) provides that, "[i]f a counting team is unable to determine a voter's intent in casting a ballot, the ballot shall be presented to the county canvassing board for it to determine the voter's intent." This legislative emphasis on discerning the voter's intent is mirrored in the case law of this State, and in that of other states.
This Court has repeatedly held, in accordance with the statutory law of this State, that so long as the voter's intent may be discerned from the ballot, the vote constitutes a "legal vote" that should be counted. See McAlpin v. State ex rel. Avriett, 155 Fla. 33, 19 So.2d 420 (1944); see also State ex rel. Peacock v. Latham, 25 Fla. 69, 70, 169 So. 597, 598 (1936) (holding that the election contest statute "affords an efficient available remedy and legal procedure by which the circuit court can investigate and determine, not only the legality of the votes cast, but can correct any inaccuracies in the count of the ballots by having them brought into the court and examining the contents of the ballot boxes if properly preserved"). As the State has moved toward electronic voting, nothing in this evolution has diminished the longstanding case law and statutory law that the intent of the voter is of paramount concern and should always be given effect if the intent can be determined. Cf. Boardman v. Esteva, 323 So.2d 259 (Fla.1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976) (recognizing the overarching principle that, where voters do all that statutes require them to do, they should not be disfranchised solely because of failure of election officials to follow directory statutes).
Not surprisingly, other states also have recognized this principle. Cf. Delahunt v. Johnston, 423 Mass. 731, 671 N.E.2d 1241 (1996) (holding that a vote should be counted as a legal vote if it properly indicates the voter's intent with reasonable certainty); Duffy v. Mortenson, 497 N.W.2d 437 (S.D.1993) (applying the rule that every marking found where a vote should be should be treated as an intended vote in the absence of clear evidence to the clear contrary); Pullen v. Mulligan, 138 Ill.2d 21, 149 Ill.Dec. 215, 561 N.E.2d 585 (1990) (holding that votes could be recounted by *1257 manual means to the extent that the voter's intent could be determined with reasonable certainty, despite the existence of a statute which provided that punch card ballots were to be recounted by automated tabulation equipment).
Accordingly, we conclude that a legal vote is one in which there is a "clear indication of the intent of the voter." We next address whether the term "rejection" used in section 102.168(3)(c) includes instances where the County Canvassing Board has not counted legal votes. Looking at the statutory scheme as a whole, it appears that the term "rejected" does encompass votes that may exist but have not been counted. As explained above, in 1999, the Legislature substantially revised the contest provision of the Election Code. See H.R. Comm. on Election Reform, HB 281 (February 3, 1999). One of the revisions to the contest provision included the codification of the grounds for contesting an election. See id. at 7. The House Bill noted that one of the grounds for contesting an election at common law was the "Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election." As noted above, the contest statute ultimately contained this ground for contesting the results of an election.
To further determine the meaning of the term "rejection", as used by the Legislature, we may also look to Florida case law. In State ex rel. Clark v. Klingensmith, 121 Fla. 297, 163 So. 704 (1935), an individual who lost an election brought an action for quo warranto challenging his opponent's right to hold office. The challenger challenged twenty-two ballots, which he divided into four groups. One of these groups included three ballots that the challenger claimed had not been counted. See 121 Fla. at 298, 163 So. at 705. This Court concluded that "the rejection of votes from legal voters, not brought about by fraud, and not of such magnitude as to demonstrate that a free expression of the popular will has been suppressed," is insufficient to void an election, "at least unless it be shown that the votes rejected would have changed the result." 121 Fla. at 300, 163 So. at 705. Therefore, the Court appears to have equated a "rejection" of legal votes with the failure to count legal votes, while at the same time recognizing that a sufficient number of such votes must have been rejected to merit relief. This notion of "rejected" is also in accordance with the common understanding of rejection of votes as used in other election cases. In discussing the facts in Roudebush v. Hartke, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), the United States Supreme Court explained:
If a recount is conducted in any county, the voting machine tallies are checked and the sealed bags containing the paper ballots are opened. The recount commission may make new and independent determinations as to which ballots shall be counted. In other words, it may reject ballots initially counted and count ballots initially rejected. Id.

This also comports with cases from other jurisdictions that suggest that a legal vote will be deemed to have been "rejected" where a voting machine fails to count a ballot, which has been executed in substantial compliance with applicable voting requirements and reflects, the clear intent of the voter to express a definite choice. See In re Petition of Gray-Sadler, 164 N.J. 468, 753 A.2d 1101, 1105-06 (2000); In re Moffat, 142 N.J.Super. 217, 361 A.2d 74, 77 (1976).
Here, then, it is apparent that there have been sufficient allegations made which, if analyzed pursuant to the proper standard, compel the conclusion that legal votes sufficient to place in doubt the election results have been rejected in this case.

THIS CASE
We must review the instances in which appellants claim that they established that legal votes were rejected or illegal voters were included in the certifications.

*1258 The refusal to review approximately 9,000 additional Miami-Dade Ballots, which the counting machine registered as non-votes and which have never been manually reviewed.

On November 9, 2000, the Miami-Dade County Democratic Party made a timely request under section 102.166 for a manual recount.[16] After first deciding against a full manual recount, the Miami-Dade County Canvassing Board voted to begin a manual recount of all ballots cast in Miami-Dade County for the presidential election, and the manual recount began on November 19, 2000. On November 21, 2000, this Court issued its decision in Palm Beach Canvassing Board v. Harris, 772 So.2d 1220 (Fla.2000), stating that amended certifications must be filed by 5 p.m. on Sunday, November 26, 2000. The Miami-Dade Canvassing Board thereafter suspended the manual recount and voted to use the election returns previously compiled. Earlier that day, the panel had decided to limit its recount to the 10,750 "undervotes," that is, ballots on which no vote was registered by counting machines. The Board's stated reason for the suspension of the manual recount was that it would be impossible to complete the recount before the deadline set forth by this Court. At the time that the Board suspended the recount, approximately 9000 of the 10,750 undervotes had not yet been reviewed. In the two days that the Board had counted ballots, the Board identified 436 additional legal votes (from 20 percent of the precincts, representing 15 percent of the votes cast) which the machines failed to register, resulting in a net vote of 168 votes for Gore. Nonetheless, in addition to suspending further recounting, the Board also determined that it would not include the additional 436 votes that had been tabulated in its partially completed recount.
Specifically as to Miami-Dade County, the trial court found:

[A]lthough the record shows voter error, and/or, less than total accuracy, in regard to the punchcard voting devices utilized in Miami-Dade and Palm Beach Counties, which these counties have been aware of for many years, these balloting and counting problems cannot support or effect any recounting necessity with respect to Miami-Dade County, absent the establishment of a reasonable probability that the statewide election result would be different, which has not been established in this case.
The Court further finds that the Dade Canvassing Board did not abuse its discretion in any of its decisions in its review in recounting processes.
This statement is incorrect as a matter of law. In fact, as the Third District determined in Miami-Dade County Democratic Party v. Miami-Dade County Canvassing Board, 773 So.2d 1179 (Fla. 3d DCA 2000), the results of the sample manual recount and the actual commencement of the full manual recount triggered the Canvassing Board's "mandatory obligation to recount all of the ballots in the county." In addition, the circuit court was bound at the time it ruled to follow this appellate decision. This Court has determined the decisions of the district courts of appeal represent the law of this State unless and until they are overruled by this Court, and therefore, in the absence of interdistrict conflict, district court decisions bind all Florida trial courts. See Pardo v. State, 596 So.2d 665, 666 (Fla.1992).
However, regardless of this error, we again note the focus of the trial court's inquiry in an election contest authorized by *1259 the Legislature pursuant to the express statutory provisions of section 102.168 is not by appellate review to determine whether the Board properly or improperly failed to complete the manual recount. Rather, as expressly set out in section 102.168, the court's responsibility is to determine whether "legal votes" were rejected sufficient to change or place in doubt the results of the election. Without ever examining or investigating the ballots that the machine failed to register as a vote, the trial court in this case concluded that there was no probability of a different result. First, as we stated, the trial court erred as a matter of law in utilizing the wrong standard. Second, and more importantly, by failing to examine the specifically identified group of uncounted ballots that is claimed to contain the rejected legal votes, the trial court has refused to address the issue presented. Appellants have also been denied the very evidence that they have relied on to establish their ultimate entitlement to relief.[17] The trial court has presented the plaintiffs with the ultimate Catch-22, acceptance of the only evidence that will resolve the issue but a refusal to examine such evidence. We also note that whether or not the Board could have completed the manual recount by November 26, 2000, or whether the Board should have fulfilled its responsibility and completed the full manual recount it commenced, the fact remains that the manual recount was not completed through no fault of the appellant.[18]

3300 Votes in Palm Beach County
Appellants also contend that the trial court erred in finding that they failed to satisfy their burden of proof with respect to the 3300 votes that the Palm Beach County Canvassing Board reviewed and concluded did not constitute "legal votes" pursuant to section 102.168(3)(c). However, unlike the approximately 9000 ballots in Miami-Dade that the County Canvassing Board did not manually recount, the Palm Beach County Canvassing Board did complete a manual recount of these 3300 votes and concluded that, because the intent of the voter in these 3300 ballots was not discernable, these ballots did not constitute "legal votes." After the two-day trial in this case, the circuit court concluded:
[W]ith respect to the approximately 3,300 Palm Beach County ballots of which plaintiffs seek review, the Palm Beach Board properly exercised its discretion in its counting process and has judged those ballots which plaintiffs wish this court to again judge de novo.... The Palm Beach County board did not abuse its discretion in its review and recounting process. Further, it acted in full compliance with the order of the circuit court in and for Palm Beach County.
We find no error in the trial court's determination that appellants did not establish a preliminary basis for relief as to the 3300 Palm Beach County votes because *1260 the appellants have failed to make a threshold showing that "legal votes" were rejected. Although the protest and contest proceedings are separate statutory provisions, when a manual count of ballots has been conducted by the Canvassing Board pursuant to section 102.166, the circuit court in a contest proceeding does not have the obligation de novo to simply repeat an otherwise-proper manual count of the ballots. As stated above, although the trial court does not review a Canvassing Board's actions under an abuse of discretion standard, the Canvassing Board's actions may constitute evidence that a ballot does or does not qualify as a legal vote. Because the appellants have failed to introduce any evidence to refute the Canvassing Board's determination that the 3300 ballots did not constitute "legal votes," we affirm the trial court's holding as to this issue. This reflects the proper interaction of section 102.166 governing protests and manual recounts and section 102.168 governing election contests.
Whether the vote totals must be revised to include the legal votes actually identified in the Palm Beach County and Miami-Dade County manual recounts?
Appellants claim that the certified vote totals must be amended to include legal votes identified as being for one of the presidential candidates by the County Canvassing Boards of Palm Beach County and Miami-Dade during their manual recounts. After working for a period of many days, the Palm Beach County Canvassing Board conducted and completed a full manual recount in which the Board identified a net gain of 215 votes for Gore.[19] As discussed above, the Miami-Dade Canvassing Board commenced a manual recount but did not complete the recount. During the partial recount it identified an additional legal votes, of which 302 were for Gore and 134 were for Bush, resulting in a net gain of 168 votes for Gore.
The circuit court concluded as to Palm Beach County that there was not any "authority to include any returns submitted past the deadline established by the Florida Supreme Court in this election." This conclusion was erroneous as a matter of law. The deadline of November 26, 2000, at 5 p.m. was established in order to allow maximum time for contests pursuant to section 102.168. The deadline was never intended to prohibit legal votes identified after that date through ongoing manual recounts to be excluded from the statewide official results in the Elections Canvassing Commission's certification of the results of a recount of less than all of a county's ballots. In the same decision we held that all returns must be considered unless their filing would effectively prevent an election contest from being conducted or endanger the counting of Florida's electors in the presidential election.
As to Miami-Dade County, in light of our holding that the circuit court should have counted the undervote, we agree with appellants that the partial recount results should also be included in the total legal votes for this election. Because the county canvassing boards identified legal votes and these votes could change the outcome of the election, we hold that the trial court erred in rejecting the legal votes identified in the Miami-Dade County and Palm Beach County manual recounts. These votes must be included in the certified vote totals. We find that appellants did not establish that the Nassau County Canvassing Board acted improperly.

CONCLUSION
Through no fault of appellants, a lawfully commenced manual recount in Dade County was never completed and recounts that were completed were not counted. Without examining or investigating the ballots that were not counted by the machines, the trial court concluded there was no reasonable probability of a different result. However, the proper standard required *1261 by section 102.168 was whether the results of the election were placed in doubt. On this record there can be no question that there are legal votes within the 9000 uncounted votes sufficient to place the results of this election in doubt. We know this not only by evidence of statistical analysis but also by the actual experience of recounts conducted. The votes for each candidate that have been counted are separated by no more than approximately 500 votes and may be separated by as little as approximately 100 votes. Thousands of uncounted votes could obviously make a difference.
Although in all elections the Legislature and the courts have recognized that the voter's intent is paramount, in close elections the necessity for counting all legal votes becomes critical. However, the need for accuracy must be weighed against the need for finality. The need for prompt resolution and finality is especially critical in presidential elections where there is an outside deadline established by federal law. Notwithstanding, consistent with the legislative mandate and our precedent, although the time constraints are limited, we must do everything required by law to ensure that legal votes that have not been counted are included in the final election results.[20] As recognized by the Florida House of Representatives Committee on Election Reform 1997 Interim Project on Election Contests and Recounts:
[A]ll election contests and recounts can be traced to either an actual failure in the election system or a perception that the system has failed. Public confidence in the election process is essential to our democracy. If the voter cannot be assured of an accurate vote count, or an election unspoiled by fraud, they will not have faith in other parts of the political process. Nonetheless, it is inevitable that legitimate doubts of the validity and accuracy of election outcomes will arise. It is crucial, therefore, to have clearly defined legal mechanisms for contesting or recounting election results.
Id. at 21 (emphasis supplied) (footnote omitted).
Only by examining the contested ballots, which are evidence in the election contest, can a meaningful and final determination in this election contest be made. As stated above, one of the provisions of the contest statute, section 102.168(8), provides that the circuit court judge may "fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined or checked, to prevent any alleged wrong, and to provide any relief appropriate under such circumstances." (Emphasis supplied.)
In addition to the relief requested by appellants to count the Miami-Dade undervote, claims have been made by the various appellees and intervenors that because this is a statewide election, statewide remedies would be called for. As we discussed in this opinion, we agree. While we recognize that time is desperately short, we cannot in good faith ignore the appellants' right to relief as to their claims concerning the uncounted votes in Miami-Dade County, nor can we ignore the correctness of the assertions that any analysis and ultimate remedy should be made on a statewide basis.[21]
*1262 We note that the contest statutes vest broad discretion in the circuit court to "provide any relief appropriate under the circumstances." § 102.168(5). Moreover, because venue of an election contest that covers more than one county lies in Leon County, see § 102.1685, Fla. Stat. (2000), the circuit court has jurisdiction, as part of the relief it orders, to order the Supervisor of Elections and the Canvassing Boards, as well as the necessary public officials, in all counties that have not conducted a manual recount or tabulation of the undervotes in this election to do so forthwith, said tabulation to take place in the individual counties where the ballots are located.[22]
Accordingly, for the reasons stated in this opinion, we reverse the final judgment of the trial court dated December 4, 2000, and remand this cause for the circuit court to immediately tabulate by hand the approximate 9000 Miami-Dade ballots, which the counting machine registered as nonvotes, but which have never been manually reviewed, and for other relief that may thereafter appear appropriate. The circuit court is directed to enter such orders as are necessary to add any legal votes to the total statewide certifications and to enter any orders necessary to ensure the inclusion of the additional legal votes for Gore in Palm Beach County[23] and the 168 additional legal votes from Miami-Dade County.
Because time is of the essence, the circuit court shall commence the tabulation of the Miami-Dade ballots immediately. The circuit court is authorized, in accordance with the provisions of section 102.168(8), to be assisted by the Leon County Supervisor of Elections or his sworn designees. Moreover, since time is also of the essence in any statewide relief that the circuit court must consider, any further statewide relief should also be ordered forthwith and simultaneously with the manual tabulation of the Miami-Dade undervotes.
In tabulating the ballots and in making a determination of what is a "legal" vote, the standard to be employed is that established by the Legislature in our Election Code which is that the vote shall be counted as a "legal" vote if there is "clear indication of the intent of the voter." § 101.5614(5), Fla. Stat. (2000).
It is so ordered.
ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., dissents with an opinion.
HARDING, J., dissents with an opinion, in which SHAW, J., concurs.
WELLS, C.J., dissenting.
I join Justice Harding's dissenting opinion except as to his conclusions with regard to error by Judge Sauls and his conclusions as to the separateness of sections 102.166 and 102.168, Florida Statutes *1263 (2000). I write separately to state my additional conclusions and concerns.
I want to make it clear at the outset of my separate opinion that I do not question the good faith or honorable intentions of my colleagues in the majority. However, I could not more strongly disagree with their decision to reverse the trial court and prolong this judicial process. I also believe that the majority's decision cannot withstand the scrutiny which will certainly immediately follow under the United States Constitution.
My succinct conclusion is that the majority's decision to return this case to the circuit court for a count of the under-votes from either Miami-Dade County or all counties has no foundation in the law of Florida as it existed on November 7, 2000, or at any time until the issuance of this opinion. The majority returns the case to the circuit court for this partial recount of under-votes on the basis of unknown or, at best, ambiguous standards with authority to obtain help from others, the credentials, qualifications, and objectivity of whom are totally unknown. That is but a first glance at the imponderable problems the majority creates.
Importantly to me, I have a deep and abiding concern that the prolonging of judicial process in this counting contest propels this country and this state into an unprecedented and unnecessary constitutional crisis. I have to conclude that there is a real and present likelihood that this constitutional crisis will do substantial damage to our country, our state, and to this Court as an institution.
On the basis of my analysis of Florida law as it existed on November 7, 2000, I conclude that the trial court's decision can and should be affirmed. Under our law, of course, a decision of a trial court reaching a correct result will be affirmed if it is supportable under any theory, even if an appellate court disagrees with the trial court's reasoning. Dade County School Bd. v. Radio Station WQBA, 731 So.2d 638, 644-645 (Fla.1999). I conclude that there are more than enough theories to support this trial court's decision.
There are two fundamental and historical principles of Florida law that this Court has recognized which are relevant here. First, at common law, there was no right to contest an election; thus, any right to contest an election must be construed to grant only those rights that are explicitly set forth by the Legislature. See McPherson v. Flynn, 397 So.2d 665, 668 (Fla.1981). In Flynn, we held that, "[a]t common law, except for limited application of quo warranto, there was no right to contest in court any public election, because such a contest is political in nature and therefore outside the judicial power." Id. at 667.
Second, this Court gives deference to decisions made by executive officials charged with implementing Florida's election laws. See Krivanek v. Take Back Tampa Political Committee, 625 So.2d 840 (Fla.1993). In Krivanek, we said:
We acknowledge that election laws should generally be liberally construed in favor of an elector. However, the judgment of officials duly charged with carrying out the election process should be presumed correct if reasonable and not in derogation of the law. Boardman v. Esteva, 323 So.2d 259 (Fla.1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976). As noted in Boardman:

The election process is subject to legislative prescription and constitutional command and is committed to the executive branch of government through duly designated officials all charged with specific duties.... [The] judgments [of those officials] are entitled to be regarded by the courts as presumptively correct and if rational and not clearly outside legal requirements should be upheld rather than substituted by the impression a particular judge or panel of judges might deem more appropriate. It is certainly the *1264 intent of the constitution and the legislature that the results of elections are to be efficiently, honestly and promptly ascertained by election officials to whom some latitude of judgment is accorded, and that courts are to overturn such determinations only for compelling reasons when there are clear, substantial departures from essential requirements of law.
Id. at 844-45. (alterations in original). These two concepts are the foundation of my analysis of the present case.
At the outset, I note that, after an evidentiary hearing, the trial court expressly found no dishonesty, gross negligence, improper influence, coercion, or fraud in the balloting and counting processes based upon the evidence presented. I conclude this finding should curtail this Court's involvement in this election through this case and is a substantial basis for affirming the trial court. Historically, this Court has only been involved in elections when there have been substantial allegations of fraud and then only upon a high threshold because of the chill that a hovering judicial involvement can put on elections. This to me is the import of this Court's decision in Boardman v. Esteva, 323 So.2d 259 (Fla. 1975). We lowered that threshold somewhat in Beckstrom v. Volusia County Canvassing Board, 707 So.2d 720 (Fla.1998), but we continued to require a substantial noncompliance with election laws. That must be the very lowest threshold for a court's involvement.
Otherwise, we run a great risk that every election will result in judicial testing. Judicial restraint in respect to elections is absolutely necessary because the health of our democracy depends on elections being decided by voters-not by judges. We must have the self-discipline not to become embroiled in political contests whenever a judicial majority subjectively concludes to do so because the majority perceives it is "the right thing to do." Elections involve the other branches of government. A lack of self-discipline in being involved in elections, especially by a court of last resort, always has the potential of leading to a crisis with the other branches of government and raises serious separation-of-powers concerns.
I find that the trial judge correctly concluded that plaintiffs were not entitled to a manual recount. Appellants filed this current election contest after protests in Palm Beach and Miami-Dade Counties. Section 102.168, Florida Statutes, in its present form is a new statute adopted by the Legislature in 1999. I conclude that the present statutory scheme contemplates that protests of returns[24] and requests for manual recounts[25] are first to be presented to the county canvassing boards. See § 102.166, Fla. Stat. This naturally follows from the fact that, even with the adoption of the 1999 amendments to section 102.168, the only procedures for manual recounts are in the protest statute. Once a protest has been filed, a county canvassing board then has the discretion, in accordance with the procedures set forth in section 102.166(4), Florida Statutes, whether to order a sample limited manual recount. See § 102.166(4)(c), Fla. Stat. (2000). Once the sample recount is complete and the county canvassing board concludes that there was an error in the vote tabulation that could affect the outcome of the election, section 102.166(5) instructs what must then be done. One option is to manually recount all ballots. See § 102.166(5)(c), Fla. Stat. (2000).[26]
*1265 I believe that the contest and protest statutes must logically be read together. The contest statute has significant references to the protest statute. If there is a protest, a party authorized by the statute to file a contest must file a complaint "within 5 days after midnight of the date the last county canvassing board empowered to canvass the returns certifies the results of that particular election following a protest pursuant to s. 102.166(1)." § 102.168(2), Fla. Stat. (2000). In the election contest, the canvassing board is the proper party defendant under section 102.168(4). Further, under section 102.168(8), the circuit judge to whom the contest is presented may fashion such orders as he or she deems necessary to ensure that the allegations upon which the complaint is brought are investigated, examined, or checked.
I find correct the analysis undertaken in Broward County Canvassing Board v. Hogan, 607 So.2d 508 (Fla. 4th DCA 1992), a case recently cited by this Court in Palm Beach County Canvassing Board v. Harris, 772 So.2d 1220 (Fla.2000). In Hogan, the Fourth District Court of Appeal reversed the trial court's order granting a manual recount, in contravention of the county canvassing board's decision noting that:
Although section 102.168 grants the right of contest, it does not change the discretionary aspect of the review procedures outlined in section 102.166. The statute clearly leaves the decision whether or not to hold a manual recount of the votes as a matter to be decided within the discretion of the canvassing board.
Id. at 510. I do not believe there is any sound reason to conclude that the Legislature's adoption of revised section 102.168 in 1999 intended to change this and provide for a duplicative recount by an individual circuit judge.
I also agree with the trial judge's conclusion that in a statewide election the only way a court can order a manual recount of ballots that were allegedly not counted because of some irregularity or inaccuracy in the balloting or counting process is to order that the votes in all counties in which those processes were used be recounted. I do not find any legal basis for the majority of this Court to simply cast aside the determination by the trial judge made on the proof presented at a two-day evidentiary hearing that the evidence did not support a statewide recount. To the contrary, I find the majority's decision in that regard quite extraordinary.
Section 102.168(3), Florida Statues (2000), states in pertinent part:
The grounds for contesting an election under this section are:
. . . .
(c) Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election.
(Emphasis added.) In other words, to establish a cause of action, plaintiff must allege an irregularity that places in doubt the result of the election. First, to "contest" simply means to challenge. See Webster's Dictionary 250 (10th ed.1994). Second, section 102.168(5), provides:
A statement of the grounds of contest may not be rejected, nor the proceedings dismissed, by the court for any want of form if the grounds of contest provided in the statement are sufficient to clearly inform the defendant of the particular proceeding or cause for *1266 which the nomination or election is contested.

(Emphasis added.) Upon my reading of the statute, I conclude that the language "grounds of contest" unambiguously means: a basis upon which a plaintiff can establish a cause of action. This standard is simply the threshold that must be met to bring forth the contest action. Thus, this standard is not the standard that the judge must use in deciding whether a plaintiff who brings the contest has successfully met his or her burden to order a recount or set aside election results. Although it is unclear from case law what standard must be satisfied in order to grant appropriate relief, it undoubtedly cannot be a low standard. Recently, in Beckstrom, this Court declined to invalidate an election despite a finding that the canvassing board was grossly negligent and in substantial noncompliance with the absentee voting statutes. See Beckstrom. Thus, merely stating the cause of action under the contest statute does not entitle a party to a recount or require the court to set aside an election. More must be required. This is especially true here, where, as in Beckstrom, the trial judge found no dishonesty, gross negligence, improper influence, coercion, or fraud in the balloting and counting processes. Thus, a plaintiff's burden in establishing grounds on which a circuit judge could order relief of any kind was simply not met. It is illogical to interpret section 102.168(3)(c) to set such a low standard where a plaintiff merely has to allege a cause of action to successfully carry the contest.[27]
Furthermore, even conceding that the trial judge at the outset applied an erroneous "probability of doubt" standard in deciding that plaintiffs failed to meet their burden of establishing a cause of action, the trial judge faced a conundrum that must be adequately explained. Plaintiffs asked the trial judge to grant the very remedya recount of the undervotes they prayed for without first establishing that remedy was warranted. Before any relief is granted, a plaintiff must allege that enough legal votes were rejected to place in doubt the results of the election. However, in order for the plaintiffs to meet this burden, the under-vote ballots must be preliminarily manually recounted. Following this logic to its conclusion would require a circuit court to order partial manual recounts upon the mere filing of a contest. This proposition plainly has no basis in law.
As I have stated, I conclude in the case at bar that sections 102.166 and 106.168 must be read in pari materia. My analysis in this regard is bolstered in situations, as here, where there was an initial protest filed in a county pursuant to section 102.166 and a subsequent contest of that same county's return pursuant to section 102.168. It appears logical to me that a circuit judge in a section 102.168 contest should review a county canvassing board's determinations in a section 102.166 protest under an abuse-of-discretion standard. I see no other reason why the county canvassing board would be a party defendant if the circuit court is not intended to evaluate the canvassing board's decisions with respect to manual recount decisions made in a section 102.166 protest. Finally, it is plain to me that it is only in section 102.166 that there are any procedures for manual recounts which address the logistics of a recount, including who is to conduct the count, that it is to take place in public, and what is to be recounted.[28]
*1267 The majority quotes section 101.5614(5) for the proposition of settling how a county canvassing board should count a vote. The majority states that "[n]o vote shall be declared invalid or void if there is a clear indication of the intent of the voter as determined by the canvassing board." § 101.5614(5), Fla. Stat. (2000). Section 101.5614(5), however, is a statute that authorizes the creation of a duplicate ballot where a "ballot card ... is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment." There is no basis in this record that suggests that the approximately 9000 ballots from Miami-Dade County were damaged or defective.
Laying aside this problem and assuming the majority is correct that section 101.5614(5) correctly annunciates the standard by which a county canvassing board should judge a questionable ballot, section 101.5614(5) utterly fails to provide any meaningful standard. There is no doubt that every vote should be counted where there is a "clear indication of the intent of the voter." The problem is how a county canvassing board translates that directive to these punch cards. Should a county canvassing board count or not count a "dimpled chad" where the voter is able to successfully dislodge the chad in every other contest on that ballot? Here, the county canvassing boards disagree. Apparently, some do and some do not. Continuation of this system of county-by-county decisions regarding how a dimpled chad is counted is fraught with equal protection concerns which will eventually cause the election results in Florida to be stricken by the federal courts or Congress.[29]
Based upon this analysis and adhering to the interpretation of the 1992 Hogan case, I conclude the circuit court properly looked at what the county canvassing boards had done and found that they did not abuse their discretion. Regarding Miami-Dade County, I find that the trial judge properly concluded that the Miami-Dade Canvassing Board did not abuse its discretion in deciding to discontinue the manual recount begun on November 19, 2000. Evidence presented at trial indicated that the Miami-Dade Board made three different decisions in respect to manual recounts. The first decision was not to count, the second was to count, and the third was not to count. The third decision was based upon the determination by the Miami-Dade Board that it could not make the November 26, 2000, deadline set by this Court in Harris and that it did not want to jeopardize disenfranchising a segment of its voters. The law does not require futile acts. See Haimovitz v. Robb, 130 Fla. 844, 178 So. 827 (1937). Section 102.166(5)(c) requires that, if there is a manual recount, all of the ballots have to be recounted. I cannot find that the Miami-Dade Board's decision that all the ballots could not be manually recounted between November 22 and November 26, 2000, to be anything but a decision based upon reality. Moreover, not to count all of the ballots if any were to be recounted would plainly be changing the rules after the election and would be unfairly discriminatory against votes in the precincts in which there was no manual recount. Thus, I agree with the trial court that the Miami-Dade Board did not abuse its discretion in discontinuing the manual recount.
In respect to the Palm Beach County Canvassing Board, I likewise find that the trial judge did not err in finding that the Palm Beach Board was within its discretion in rejecting the approximately 3300 votes in which it could not discern voter intent. As set forth in Boardman, the county canvassing boards are vested with the responsibility to make judgments on the validity of ballots, and its determinations will be overturned only for compelling reasons when there are clear, substantial departures from essential requirements of law. See Boardman, *1268 323 So.2d at 268 n.5. Appellants have not met this burden.
I also agree with the trial judge that the Elections Canvassing Commission (Commission) did not abuse its discretion in refusing to accept either an amended return reflecting the results of a partial manual recount or a late amended return filed by the Palm Beach Board. I conclude that it is plain error for the majority to hold that the Commission abused its discretion in enforcing a deadline set by this Court that recounts be completed and certified by November 26, 2000. I conclude that this not only changes a rule after November 7, 2000, but it also changes a rule this Court made on November 26, 2000.
As I stated at the outset, I conclude that this contest simply must end.
Directing the trial court to conduct a manual recount of the ballots violates article II, section 1, clause 2 of the United States Constitution, in that neither this Court nor the circuit court has the authority to create the standards by which it will count the under-voted ballots. The Constitution reads in pertinent part: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors." U.S. Const. art. II, § 1, cl. 2. The Supreme Court has described this authority granted to the state legislatures as "plenary." See McPherson v. Blacker, 146 U.S. 1, 7, 13 S.Ct. 3, 36 L.Ed. 869 (1892). "Plenary" is defined as "full, entire, complete, absolute, perfect, [and] unqualified." Black's Law Dictionary 1154 (6th ed.1990).
The Legislature has given to the county canvassing boards-and only these boards the authority to ascertain the intent of the voter. See § 102.166(7)(b), Fla. Stat. (2000). Just this week, the United States Supreme Court reminded us of the teachings from Blacker when it said:
"[Art. II, § 1, cl. 2] does not read that the people or the citizens shall appoint, but that `each State shall'; and if the words `in such manner as the legislature thereof may direct,' had been omitted, it would seem that the legislative power of appointment could not have been successfully questioned in the absence of any provision in the state constitution in that regard. Hence the insertion of those words, while operating as a limitation upon the State in respect of any attempt to circumscribe the legislative power, cannot be held to operate as a limitation on that power itself."
Bush v. Palm Beach County Canvassing Bd., 69 U.S.L.W. 4020, 4021, 531 U.S. ___, ___, 121 S.Ct. 471, 473-474, 148 L.Ed.2d 366, 371 (U.S.2000) (quoting Blacker, 146 U.S. at 25, 13 S.Ct. 3). Clearly, in a presidential election, the Legislature has not authorized the courts of Florida to order partial recounts, either in a limited number of counties or statewide. This Court's order to do so appears to me to be in conflict with the United States Supreme Court decision.
Laying aside the constitutional infirmities of this Court's action today, what the majority actually creates is an overflowing basket of practical problems. Assuming the majority recognizes a need to protect the votes of Florida's presidential electors,[30] the entire contest must be completed "at least six days before" December 18, 2000, the date the presidential electors meet to vote. See 3 U.S.C. § 5 (1994). The safe harbor deadline day is December 12, 2000. Today is Friday, December 8, 2000. Thus, under the majority's time line, all manual recounts must be completed in five days, assuming the counting begins today.
*1269 In that time frame, all questionable ballots must be reviewed by the judicial officer appointed to discern the intent of the voter in a process open to the public.[31] Fairness dictates that a provision be made for either party to object to how a particular ballot is counted. Additionally, this short time period must allow for judicial review. I respectfully submit this cannot be completed without taking Florida's presidential electors outside the safe harbor provision, creating the very real possibility of disenfranchising those nearly six million voters who were able to correctly cast their ballots on election day.
Another significant problem is that the majority returns this case to the circuit court for a recount with no standards. I do not, and neither will the trial judge, know whether to count or not count ballots on the criteria used by the canvassing boards, what those criteria are, or to do so on the basis of standards divined by Judge Sauls. A continuing problem with these manual recounts is their reliability. It only stands to reason that many times a reading of a ballot by a human will be subjective, and the intent gleaned from that ballot is only in the mind of the beholder. This subjective counting is only compounded where no standards exist or, as in this statewide contest, where there are no statewide standards for determining voter intent by the various canvassing boards, individual judges, or multiple unknown counters who will eventually count these ballots.
I must regrettably conclude that the majority ignores the magnitude of its decision. The Court fails to make provision for: (1) the qualifications of those who count; (2) what standards are used in the count-are they the same standards for all ballots statewide or a continuation of the county-by-county constitutionally suspect standards; (3) who is to observe the count; (4) how one objects to the count; (5) who is entitled to object to the count; (6) whether a person may object to a counter; (7) the possible lack of personnel to conduct the count; (8) the fatigue of the counters; and (9) the effect of the differing intra-county standards.
This Court's responsibility must be to balance the contest allegations against the rights of all Florida voters who are not involved in election contests to have their votes counted in the electoral college. To me, it is inescapable that there is no practical way for the contest to continue for the good of this country and state.
I am persuaded that Justice Terrell was correct in 1936 when he said:
This court is committed to the doctrine that extraordinary relief will not be granted in cases where it plainly appears that although the complainant party may be ordinarily entitled to it, if the granting of such relief in the particular case will result in confusion and disorder and will produce an injury to the public which outweighs the individual right of the complainant to have the relief he seeks.

State ex rel. Pooser v. Wester, 126 Fla. 49, 54, 170 So. 736, 738-39 (1936) (emphasis added).
For a month, Floridians have been working on this problem. At this point, I am convinced of the following.
First, there have been an enormous number of citizens who have expended heroic efforts as members of canvassing boards, counters, and observers, and as legal counsel who have in almost all instances, in utmost good faith attempted to bring about a fair resolution of this election. I know that, regardless of the outcome, all of us are in their debt for their efforts on behalf of representative democracy.
Second, the local election officials, state election officials, and the courts have been attempting to resolve the issues of this election with an election code which any objective, frank analysis must conclude *1270 never contemplated this circumstance. Only to state a few of the incongruities, the time limits of sections 102.112, 102.166, and 102.168 and 3 U.S.C. §§ 1, 5, and 7 simply do not coordinate in any practical way with a presidential election in Florida in the year 2000. Therefore, section 102.168, Florida Statues, is inconsistent with the remedy being sought here because it is unclear in a presidential election as to: (1) whether the candidates or the presidential electors should be party to this election contest; (2) what the possible remedy would be; and (3) what standards to apply in counting the ballots statewide.
Third, under the United States Supreme Court's analysis in Bush v. Palm Beach County Canvassing Board, wherein the Supreme Court calls to our attention McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1892), there is uncertainty as to whether the Florida Legislature has even given the courts of Florida any power to resolve contests or controversies in respect to presidential elections.
Fourth, there is no available remedy for the appellants on the basis of these allegations. Quite simply, courts cannot fairly continue to proceed without jeopardizing the votes and rights of other citizens through a further count of these votes.
I must take seriously the counsel of the Supreme Court in Bush:
Since [3 U.S.C.] § 5 contains a principle of federal law that would assure finality of the State's determination if made pursuant to a state law in effect before the election, a legislative wish to take advantage of the "safe harbor" would counsel against any construction of the Election Code that Congress might deem to be a change in the law.
69 U.S.L.W. at 4021, 121 S.Ct. at 474.
This case has reached the point where finality must take precedence over continued judicial process. I agree with the view attributed to John Allen Paulos, a professor of mathematics at Temple University, who was quoted as saying, "The margin of error in this election is far greater than the margin of victory, no matter who wins."[32] Further judicial process will not change this self-evident fact and will only result in confusion and disorder. Justice Terrell and this Court wisely counseled against such a course of action sixty-four years ago. I would heed that sound advice and affirm Judge Sauls.
HARDING, J., dissenting.
I would affirm Judge Sauls' order because I agree with his ultimate conclusion in this case, namely that the appellants failed to carry their requisite burden of proof and thus are not entitled to relief. However, in reaching his conclusion, Judge Sauls applied erroneous standards in two instances. First, in addressing the appellants' challenges of the election certifications in Miami-Dade and Palm Beach Counties, the judge stated that "[t]he local boards have been given broad discretion, which no court may overrule, absent a clear abuse of discretion." Applying this standard, the judge concluded that the Miami-Dade County Canvassing Board did not abuse its discretion in any of its decisions in the review and recounting process. While abuse of discretion is the proper standard for assessing a canvassing board's actions in a section 102.166 protest proceeding, it is not applicable to this section 102.168 contest proceeding. Judge Sauls improperly intertwined these two proceedings and the standards applicable to each.
In 1999, the Florida Legislature extensively amended the contest statute to specify the grounds authorized for contesting an election and to set up a time frame for contests. See ch. 99-339, § 3, at 3547-49, Laws of Fla. The Legislature also amended the protest statute by eliminating the role of the circuit courts in protest proceedings. See id., § 1, at 3546. The county canvassing boards have been granted *1271 discretion to authorize a manual recount when requested by a candidate, political party, or political committee who seeks to protest the returns of an election as being erroneous. See § 102.166(4)(c), Fla. Stat. (2000) ("The county canvassing board may authorize a manual recount.") (emphasis added).
In contrast, a contest proceeding involves a legal challenge to the outcome of an election. The circuit judge is statutorily charged with three tasks in a contest proceeding: (1) to ensure that each allegation in the contestant's complaint is investigated, examined, or checked; (2) to prevent or correct any alleged wrong; and (3) to provide any relief appropriate under such circumstances. See § 102.168(8), Fla. Stat. (2000). Where a contestant alleges that the canvassing board has rejected a number of legal votes "sufficient to change or place in doubt the result of the election" due to the board's decision to curtail or deny a manual recount, the circuit judge should examine this issue de novo and not under an abuse of discretion standard. § 102.168(3)(c), Fla. Stat. (2000).
Second, Judge Sauls erred in concluding that a contestant under section 102.168(3)(c) must show a "reasonable probability that the results of the election would have been changed." Judge Sauls cited the First District Court of Appeal's decision in Smith v. Tynes, 412 So.2d 925, 926 (Fla. 1st DCA 1982), as establishing this standard for election contests. However, as discussed above, when the Legislature amended section 102.168 in 1999, it specified five grounds for contesting an election, including the "[r]eceipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election." (Emphasis added.) Smith v. Tynes, which was decided in 1982, addressed the preamendment statute which did not specify the grounds for a contest. Thus, the current statutory standard controls here.
While I disagree with Judge Sauls on the standards applicable to this election contest, I commend him for the way that he conducted the proceedings below under extreme time constraints and pressure. Further, I believe that Judge Sauls properly concluded that there was no authority to include the Palm Beach County returns filed after the explicit deadline established by this Court.
I conclude that the application of the erroneous standards is not determinative in this case. I agree with Judge Sauls that the appellants have not carried their burden of showing that the number of legal votes rejected by the canvassing boards is sufficient to change or place in doubt the result of this statewide election. That failure of proof controls the outcome here. Moreover, as explained below, I do not believe that an adequate remedy exists under the circumstances of this case.
I conclude that Judge Sauls properly found that the evidence presented by appellants, even if believed, was insufficient to warrant any remedy under section 102.168.
The basis for appellants' claim for relief under section 102.168 is that there is a "no-vote" problem, i.e., ballots which, although counted by machines at least once, allegedly have not been counted in the presidential election. The evidence showed that this no-vote problem, to the extent it exists, is a statewide problem.[33] Appellants ask that only a subset of these no-votes be counted.
In a presidential election, however, section 102.168, by its title, is an "Election" contest and, as such, it is not a local contest seeking to define the correct winner of the popular vote in any individual county. *1272 The action is to determine whether the Secretary of State certified the correct winner for the entire State of Florida. By its plain language, section 102.168(1) provides that only the "unsuccessful candidate" may contest an election. If this contest provision may be invoked as to individual county results, as argued by appellants, then Vice President Gore's choice of the three particular counties was improper because he was not "unsuccessful" in those counties. I read the statute as applying to statewide results in statewide elections. Thus, Vice President Gore, as the unsuccessful candidate statewide, could contest the election results. However, in this contest proceeding, appellants had an obligation to show, by a preponderance of the evidence, that the outcome of the statewide election would likely be changed by the relief they sought.
Appellants failed, however, to provide any meaningful statistical evidence that the outcome of the Florida election would be different if the "no-vote" in other counties had been counted; their proof that the outcome of the vote in two counties would likely change the results of the election was insufficient. It would be improper to permit appellants to carry their burden in a statewide election by merely demonstrating that there were a sufficient number of no-votes that could have changed the returns in isolated counties. Recounting a subset of counties selected by the appellants does not answer the ultimate question of whether a sufficient number of uncounted legal votes could be recovered from the statewide "no-votes" to change the result of the statewide election. At most, such a procedure only demonstrates that the losing candidate would have had greater success in the subset of counties most favorable to that candidate.
Moreover, assuming that there may be some shortfall in counting the votes cast with punch card ballots, such a problem is only properly considered as being systemic with the punch card system itself, and any remedy would have had to be statewide. Any other remedy would disenfranchise tens of thousands of other Florida voters, as I have serious concerns that appellant's interpretation of 102.168 would violate other voters' rights to due process and equal protection of the law under the Fifth and Fourteenth Amendments to the United States Constitution.
As such, I would find that the selective recounting requested by appellant is not available under the election contest provisions of section 102.168. Such an application does not provide for a more accurate reflection of the will of the voters but, rather, allows for an unfair distortion of the statewide vote. It is patently unlawful to permit the recount of "no-votes" in a single county to determine the outcome of the November 7, 2000, election for the next President of the United States. We are a nation of laws, and we have survived and prospered as a free nation because we have adhered to the rule of law. Fairness is achieved by following the rules.
Finally, even if I were to conclude that the appellants' allegations and evidence were sufficient to warrant relief, I do not believe that the rules permit an adequate remedy under the circumstances of this case. This Court, in its prior opinion, and all of the parties agree that election controversies and contests must be finally and conclusively determined by December 12, 2000. See 3 U.S.C. § 5. This Court is "not required to do a useless act nor are we required to act if it is impossible for us to grant effectual relief." State v. Strasser, 445 So.2d 322, 322 (Fla.1983). See also Hoshaw v. State, 533 So.2d 886, 887 (Fla. 3d DCA 1988) ("The law does not require futile acts."); International Fidelity Ins. Co. v. Prestige Rent-A-Car, Inc., 715 So.2d 1025, 1028 (Fla. 5th DCA 1998) ("Florida law does not require trial courts to enter orders which are impossible to execute or which require parties to perform acts that cannot be of any force or effect."). Clearly, the only remedy authorized by law would be a statewide recount of more than 170,000 "no-vote" ballots by *1273 December 12. Even if such a recount were possible, speed would come at the expense of accuracy, and it would be difficult to put any faith or credibility in a vote total achieved under such chaotic conditions. In order to undertake this unprecedented task, the majority has established standards for manual recounts-a step that this Court refused to take in an earlier case,[34] presumably because there was no authority for such action and nothing in the record to guide the Court in setting such standards. The same circumstances exist in this case. All of the parties should be afforded an opportunity to be heard on this very important issue.
While this Court must be ever mindful of the Legislature's plenary power to appoint presidential electors, see U.S. Const. art. II, § 1, cl. 2, I am more concerned that the majority is departing from the essential requirements of the law by providing a remedy which is impossible to achieve and which will ultimately lead to chaos. In giving Judge Sauls the direction to order a statewide recount, the majority permits a remedy which was not prayed for, which is based upon a premise for which there is no evidence, and which presents Judge Sauls with directions to order entities (i.e. local canvassing boards) to conduct recounts when they have not been served, have not been named as parties, but, most importantly, have not had the opportunity to be heard. In effect, the majority is allowing the results of the statewide election to be determined by the manual recount in Miami-Dade County because a statewide recount will be impossible to accomplish. Even if by some miracle a portion of the statewide recount is completed by December 12, a partial recount is not acceptable. The uncertainty of the outcome of this election will be greater under the remedy afforded by the majority than the uncertainty that now exists.
The circumstances of this election call to mind a quote from football coaching legend Vince Lombardi: "We didn't lose the game, we just ran out of time."
SHAW, J., concurs.
NOTES
[1] The parties have agreed that this appeal is properly before this Court.
[2] The appellants have alternatively styled their request for relief as a Petition for Writ of Mandamus or Other Writs.
[3] See §§ 102.111, .121, Fla. Stat. (2000).
[4] Bush received 2,912,790 votes while Gore received 2,912,253 votes.
[5] See § 102.168(3)(c), Fla. Stat. (2000).
[6] Bush claims in his brief that the audited total is 176 votes. We make no determination as to which of these two numbers are accurate but direct the trial court to make this determination on remand.
[7] In a substantial and dramatic change of position after oral argument in this case, Bush contends in his "Motion for Leave To File Clarification of Argument" that section 102.168 cannot apply in the context of a presidential election. However, this position is in stark contrast to his position both in this case and in the prior appeal. In fact, in oral argument on December 7, 2000, counsel for Bush agreed that the contest provisions contained in the Florida Election Code have placed such proceedings within the arena for judicial determination, which includes the established procedures for appellate review of circuit court determinations. Further, Bush's counsel, Michael Carvin, in the prior oral argument in Palm Beach Canvassing Board v. Harris, in arguing against allowing manual recounts to continue in the protest phase, stated that he did not

think there would be any problem in producing... that kind of evidence in an election contest procedure ... instead of having every court in Florida resolving on an ad hoc basis the kinds of ballots that are valid and not valid, you would be centralizing the factual inquiry in one court in Leon County. So you would bring some orderliness to the process, and they would be able to resolve that evidentiary question. One way or another, a court's going to have resolve it.
(Emphasis supplied.) Moreover, the Answer Brief of Bush in Case Nos. SC00-2346, 2348, and 2349 (Nov. 18, 2000) at page 18 states that "to implement Petitioners' desired policy of manual recounts at all costs, the Court is asked to ... (5) substitute the certification process of Section 102.111 and Section 102.112 for the contested election process of Section 102.168 as the means for determining the accuracy of the vote tallies." (Emphasis supplied.) In addition, the December 5, 2000 brief of Amici Curiae of the Florida House of Representatives and the Florida Senate, in case nos. SC00-2346, SC00-2348 & SC00-2349 (Dec. 5, 2000) at 8 "The Secretary's opinion was also consistent with the fact that the statutory protests that can lead to manual recounts are county-specific complaints about a particular county's machines, whereas a complaint about punchcards generally undercounting votes really raises a statewide issue that should be pursued, if at all, only in a statewide contest." (Emphasis supplied.) Finally the Amended Answer Brief of the Secretary of State asserted that
[p]etitioner has confused a pre-certification election protest (section 102.166) with a post-certification contest (section 102.168). Such facts and circumstances are usually discovered and raised in a contest action that cannot begin until after the election is certified. The Legislature imposed a deadline for certification because of the short time frame within which to begin and conclude an election contest. Petitioners are, in effect, asking this Court to delay the commencement of election contest actions, if any, by improperly using the protest procedures to contest the election before certification. Because the facts and circumstances concerning voter error and ballot design in Palm Beach County are more properly raised in a contest action, these facts were not relevant to the Secretary's decision to certify the election. Her decision triggered the time for bringing any election contest actions.
(Emphasis supplied.)
[8] Viewed historically, section 102.168 did not always provide for contests of the type we consider today. As originally enacted, section 102.168 simply provided a mechanism for ouster of elected local officials. Under that version of the statute, election challenges were limited to county offices, and only the person claiming to have been rightfully elected to the position could challenge the election. See ch. 38, art. 10, §§ 7-9, Laws of Fla. (1845).
[9] The following language of section 102.168, Florida Statutes was changed in 1999 (words stricken are deletions; words underlined are additions):

(1) Except as provided in s. 102.171, the certification of election or nomination of any person to office, or of the result on any question submitted by referendum, may be contested in the circuit court by any unsuccessful candidate for such office or nomination thereto or by any elector qualified to vote in the election related to such candidacy, or by any taxpayer, respectively.
(2) Such contestant shall file a complaint, together with the fees prescribed in chapter 28, with the clerk of the circuit court within 10 days after midnight of the date the last county canvassing board empowered to canvass the returns certifies the results of the election being contested or within 5 days after midnight of the date the last county canvassing board empowered to canvass the returns certifies the results of that particular election following a protest pursuant to s. 102.166(1), whichever occurs later. adjourns, and
(3) The complaint shall set forth the grounds on which the contestant intends to establish his or her right to such office or set aside the result of the election on a submitted referendum. The grounds for contesting an election under this section are:
(a) Misconduct, fraud, or corruption on the part of any election official or any member of the canvassing board sufficient to change or place in doubt the result of the election.
(b) Ineligibility of the successful candidate for the nomination or office in dispute.
(c) Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election.
(d) Proof that any elector, election official, or canvassing board member was given or offered a bribe or reward in money, property, or any other thing of value for the purpose of procuring the successful candidate's nomination or election or determining the result on any question submitted by referendum.
(e) Any other cause or allegation which, if sustained, would show that a person other than the successful candidate was the person duly nominated or elected to the office in question or that the outcome of the election on a question submitted by referendum was contrary to the result declared by the canvassing board or election board.
(4) The canvassing board or election board shall be the proper party defendant, and the successful candidate shall be an indispensable party to any action brought to contest the election or nomination of a candidate.
(5) A statement of the grounds of contest may not be rejected, nor the proceedings dismissed, by the court for any want of form if the grounds of contest provided in the statement are sufficient to clearly inform the defendant of the particular proceeding or cause for which the nomination or election is contested.
(6) A copy of the complaint shall be served upon the defendant and any other person named therein in the same manner as in other civil cases under the laws of this state. Within 10 days after the complaint has been served, the defendant must file an answer admitting or denying the allegations on which the contestant relies or stating that the defendant has no knowledge or information concerning the allegations, which shall be deemed a denial of the allegations, and must state any other defenses, in law or fact, on which the defendant relies. If an answer is not filed within the time prescribed, the defendant may not be granted a hearing in court to assert any claim or objection that is required by this subsection to be stated in an answer.
(7) Any candidate, qualified elector, or taxpayer presenting such a contest to a circuit judge is entitled to an immediate hearing. However, the court in its discretion may limit the time to be consumed in taking testimony, with a view therein to the circumstances of the matter and to the proximity of any succeeding primary or other election.
(8) The circuit judge to whom the contest is presented may fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined, or checked, to prevent or correct any alleged wrong, and to provide any relief appropriate under such circumstances.
Ch. 99-339, § 3, Laws of Fla.
[10] Gore v. Harris, No. 00-2808 (Fla.2d Cir.Ct. Dec. 4, 2000) (Proceedings at 10-11).
[11] In other words, the Legislature has prescribed a single election scheme for local, state and federal elections. The Legislature has not, beyond granting to Florida's voters the right to select presidential electors, indicated in any way that it intended that a different (and unstated) set of election rules should apply to the selection of presidential electors. Of course, because the selection and participation of Florida's electors in the presidential election process is subject to a stringent calendar controlled by federal law, the Florida election law scheme must yield in the event of a conflict.
[12] In the election contest at issue here, this Court can do no more than see that every citizen's vote be counted. But it can do no less. In a scenario somewhat analogous to that presented here, and in an election contest for a seat in the United States House of Representatives, the contesting candidate sought to exclude some 11,000 votes from being counted because the votes were not timely reported to the Secretary of State. See State ex rel. Chappell v. Martinez, 536 So.2d 1007 (Fla.1988). This Court, in a unanimous opinion authored by Justice McDonald, refused to exclude the votes and held that the contesting candidate "has presented no compelling reason for disenfranchising the 11,000 residents of Flagler County who cast their ballots on November 8." Id. at 1009.
[13] Smith v. Tynes, 412 So.2d 925 (Fla. 1st DCA 1982) (involving allegations of enumerated acts asserted to constitute fraud and misrepresentation to the electorate sufficient to produce a different result) (citing Nelson v. Robinson, 301 So.2d 508 (Fla. 2d DCA 1974), cert. denied 303 So.2d 21 (Fla.1974) (involving a post-election challenge to a form of ballot which listed the candidates for a single office in alphabetical order using the same color ink, but on different lines)).
[14] Cf. Standard Jury Instructions in Criminal Cases, 697 So.2d 84, 90 (Fla.1997) (approving standard jury instruction regarding "reasonable doubt," which is "not a mere possible doubt, a speculative, imaginary or forced doubt," and which "may arise from the evidence, conflict in the evidence or the lack of evidence").
[15] In this case, the circuit court did not review the ballots presented as evidence.
[16] On November 9, 2000, a manual recount was requested on behalf of Vice President Gore in four countiesMiami-Dade, Broward, Palm Beach and Volusia. Broward County and Volusia County timely completed a manual recount. It is undisputed that the results of the manual recounts in Volusia County and Broward County were included in the statewide certifications.
[17] The Miami-Dade Canvassing Board stated as its reasons that it stopped an ongoing manual recount because it determined that it could not meet this Court's certification deadline. However, nothing in this Court's prior opinion nor the statutory scheme governing manual recounts would have prevented the Board from continuing after certification the manual recount that it had properly started. The Canvassing Board is a neutral ministerial body. See Morse v. Dade County Canvassing Board, 456 So.2d 1314 (Fla. 3d DCA 1984). Therefore, although the Board may have acted in a neutral fashion, the fact remains that three other Boards (Broward, Palm Beach and Volusia) completed the recounts.
[18] On Thanksgiving Day, November 23, 2000, an Emergency Petition for Writ for Mandamus was filed in which Gore sought to compel the Miami-Dade Canvassing Board to continue with the manual recount. Although we denied relief on that same day, in our order denying this relief, the Court specifically stated that the denial was "without prejudice to any party raising any issue presented in the writ in any future proceeding." Accordingly, at the time that we denied mandamus relief we clearly contemplated that this claim could be raised in a contest action.
[19] Bush asserted that the audited total is 176 votes.
[20] This presidential election has demonstrated the vulnerability of what we believe to be a bedrock principle of democracy: that every vote counts. While there are areas in this State which implement systems (such as the optical scanner) where the margins of error, and the ability to demonstrably verify those margins of error, are consistent with accountability in our democratic process, in these election contests based upon allegations that functioning punch-card voting machines have failed to record legal votes, the demonstrated margins of error may be so great to suggest that it is necessary to reevaluate utilization of the mechanisms employed as a viable system.
[21] The dissents would have us throw up our hands and say that because of looming deadlines and practical difficulties we should give up any attempt to have the election of the presidential electors rest upon the vote of Florida citizens as mandated by the Legislature. While we agree that practical difficulties may well end up controlling the outcome of the election we vigorously disagree that we should therefore abandon our responsibility to resolve this election dispute under the rule of law. We can only do the best we can to carry out our sworn responsibilities to the justice system and its role in this process. We, and our dissenting colleagues, have simply done the best we can, and remain confident that others charged with similar heavy responsibilities will also do the best they can to fulfill their duties as they see them.
[22] We are mindful of the fact that due to the time constraints, the count of the undervotes places demands on the public servants throughout the State to work over this weekend. However, we are confident that with the cooperation of the officials in all the counties, the remaining undervotes in these counties can be accomplished within the required time frame. We note that public officials in many counties have worked diligently over the past thirty days in dealing with exigencies that have occurred because of this unique historical circumstance arising from the presidential election of 2000. We commend those dedicated public servants for attempting to make this election process truly reflect the vote of all Floridians.
[23] See discussion supra note 6.
[24] See § 102.166(1), Fla. Stat. (2000).
[25] See § 102.166(4)(b), Fla. Stat. (2000).
[26] Also problematic with the majority's analysis is that the majority only requires that the "under-votes" are to be counted. How about the "over-votes?" Section 101.5614(6) provides that a ballot should not be counted "[i]f an elector marks more names than there are persons to be elected to an office," meaning the voter voted for more than one person for president. The underlying premise of the majority's rationale is that in such a close race a manual review of ballots rejected by the machines is necessary to ensure that all legal votes cast are counted. The majority, however, ignores the over-votes. Could it be said, without reviewing the over-votes, that the machine did not err in not counting them?

It seems patently erroneous to me to assume that the vote-counting machines can err when reading under-votes but not err when reading over-votes. Can the majority say, without having the over-votes looked at, that there are no legal votes among the over-votes?
[27] In addition, under a protest the threshold that must be met to order a recount must be lower than that under a contest, which action can only be brought after certification of the returns. Therefore, the threshold to successfully carry a contest must be higher than that of a mere protest.
[28] I am persuaded that even with these procedures manual recounts by the canvassing board are constitutionally suspect. See Touchston v. McDermott, 234 F.3d 1133 (11th Cir. 2000) (Tjoflat, J., dissenting). This would be compounded by giving that power to an individual circuit judge and providing him or her with no standards.
[29] See supra note 28.
[30] As the Supreme Court recently noted, 3 U.S.C § 5 creates a safe harbor provision regarding congressional consideration of a state's electoral votes should all contests and controversies be resolved at least six days prior to December 18, 2000, if made pursuant to the state of the law as it existed on election day. See Bush, 69 U.S.L.W. at 4021, 121 S.Ct. at 474. There is no legislative suggestion that the Florida Legislature did not want to take advantage of this safe harbor provision.
[31] See § 102.166(6), Fla. Stat. (2000).
[32] Philip Gailey, The Election Is a Tie, So Let's Get On With It, St. Petersburg Times, Dec. 3, 2000, at 3D (quoting David Remnick, Comment: Decisions, Decisions, The New Yorker, Dec. 4, 2000, at 35).
[33] No-votes (ballots for which the no vote for presidential electors was recorded) exist throughout the state, not just in the counties selected by appellants. Of the 177,655 no-votes in the November 7, 2000, election in Florida, 28,492 occurred in Miami-Dade County and 29,366 occurred in Palm Beach County. See Division of Elections, Voter Turnout Report, S-DX 41; Division of Elections, General Election Results, S-DX 40.
[34] See Palm Beach County Canvassing Bd. v. Harris, 772 So.2d 1220 (Fla.2000), vacated by Bush v. Palm Beach Canvassing Bd., 69 U.S.L.W. 4020, 531 U.S. ___, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000).