773 So.2d 524 (2000)
Albert GORE, Jr., and Joseph I. Lieberman, Appellants,
v.
Katherine HARRIS, as Secretary, etc., et al., Appellees.
No. SC00-2431.
Supreme Court of Florida.
December 22, 2000.
*525 John D.C. Newton, II of Berger Davis & Singerman, Tallahassee, FL; Mitchell W. Berger of Berger Davis & Singerman, Fort Lauderdale, FL; W. Dexter Douglass of the Douglass Law Firm, Tallahassee, FL; David Boies of Boies, Schiller & Flexner, LLP, Armonk, NY; Ronald A. Klain and Andrew J. Pincus, c/o Gore/Lieberman Recount, Jeffrey D. Robinson of Baach, Robinson & Lewis, Joseph E. Sandler of Sandler & Rieff, P.C., Washington, DC; Mark R. Steinberg, Los Angeles, CA; John J. Corrigan, Jr., Boston, MA; Dennis Newman, Reading, MA; Kendall Coffey, Benedict E. Kuehne, Miami, FL; and Theresa Wynn Roseborough, Atlanta, GA, for Albert Gore, Jr. and Joseph I. Lieberman, Appellants.
Deborah K. Kearney, General Counsel, and Kerey Carpenter, Assistant General Counsel, Florida Department of State, and Joseph P. Klock, Jr., John W. Little, III, Alvin F. Lindsay III, Robert W. Pittman, Gabriel E. Nieto, Walter J. Harvey, and Ricardo M. Martinez-Cid of Steel, Hector & Davis, LLP, Tallahassee, Florida, for the Secretary of State and the Elections Canvassing Commission; Robert A. Ginsburg, Miami-Dade County Attorney, Murray A. Greenberg, First Assistant County Attorney, and Lee Kraftchick, Thomas A. Tucker Ronzetti, and Jeffrey P. Ehrlich, Assistant County Attorneys, Miami, FL, for Miami-Dade County Canvassing Board, Lawrence D. King, Myriam Lehr, and David C. Leahy; Michael S. Mullin, Fernandina Beach, FL, for Nassau County Canvassing Board, and Judge Robert E. Williams, Supervisor of Elections, Shirley N. King, Marianne P. Marshall, and David Howard; Leonard Berger and Andrew McMahon, Palm Beach County, West Palm Beach, FL, for Charles Burton, Carol Roberts, and Theresa Lepore, Palm Beach County Canvassing Board, and Bruce Rogow and Beverly A. Pohl, Fort Lauderdale, FL, and Robert M. Montgomery, Jr., West Palm Beach, FL, for Theresa Lepore, Supervisor of Elections; and Barry Richard of Greenberg, Traurig, P.A., Tallahassee, FL, Benjamin L. Ginsberg of Patton, Boggs, LLP, George J. Terwilliger, III, and Timothy E. Flanigan of White & Case, LLP, and Kirk Van Tine of Baker Botts, LLP, Washington, DC, for George W. Bush and Dick Cheney, Appellees.
Gary L. Printy of the Law Office of Gary L. Printy, Tallahassee, FL, for Stephen Cruce, Teresa Cruce, Terry Kelly, and Jeanette K. Seymour, Intervenors.
Terrell C. Madigan, Harold R. Mardenborough, Jr., and Christopher Barkas of McFarlain, Wiley, Cassedy & Jones, P.A., Tallahassee, FL, for Matt Butler, Intervenor.
*526 W. Robert Vezina, III and Frederick J. Springer of Vezina, Lawrence & Piscitelli, P.A., Tallahassee, FL, for John E. Thrasher, Intervenor.
William Kemper Jennings, DeFuniak Springs, FL, for Glenda Carr, Lonnette Harrell, Terry Richardson, Gary H. Shuler, Keith Temple, and Mark A. Thomas, Intervenors.
PER CURIAM.
This case is before the Court on remand from the United States Supreme Court. See Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).[1] In our previous opinion, we ordered the Circuit Court of Leon County to tabulate by hand 9000 contested Dade County ballots. See Gore v. Harris, 772 So.2d 1243, 1262 (Fla. 2000). This Court further held that relief would require manual recounts in all Florida counties where undervotes existed which had not previously been subject to manual tabulation. See id. at 1253, 1261-1262. The standard we directed be employed in the manual recount was the standard established by the Legislature in the Florida Election Code, i.e., that a vote shall be counted as a "legal" vote if there is a "clear indication of the intent of the voter." See id. at 1262 (citing section 101.5614(5), Florida Statutes (2000)). The "intent of the voter" standard adopted by the Legislature was the standard in place as of November 7, 2000, and a more expansive ruling would have raised an issue as to whether this Court would be substantially rewriting the Code after the election, in violation of article II, section 1, clause 2 of the United States Constitution and 3 U.S.C. § 5 (1994).
The per curiam opinion of the Supreme Court held that the Florida statutory standard for the manual examination of ballots violates equal protection rights. See Bush, 121 S.Ct. at 530. Although the Supreme Court found the legislatively prescribed standard to be unobjectionable as an abstract proposition and starting principle, it noted "[t]he problem inheres in the absence of specific standards to ensure its equal application." Id. The Supreme Court specified that in order for a manual recount to continue:
It would require not only the adoption (after opportunity for argument) of adequate statewide standards for determining what is a legal vote, and practicable procedures to implement them, but also orderly judicial review of any disputed matters that might arise. In addition, the Secretary of State has advised that the recount of only a portion of the ballots requires that the vote tabulation equipment be used to screen out undervotes, a function for which the machines were not designed. If a recount of overvotes were also required, perhaps even a second screening would be necessary. Use of equipment for this purpose, and any new software developed for it, would have to be evaluated for accuracy by the Secretary of State, as required by Fla. Stat. § 101.015 (2000).
Id. at 532-33. The Supreme Court ultimately mandated that any manual recount be concluded by December 12, 2000, as provided in 3 U.S.C. § 5. See id. at 533. In light of the time of the release of the Supreme Court opinion, these tasks and this deadline could not possibly be met. Moreover, upon reflection, we conclude that the development of a specific, uniform standard necessary to ensure equal application and to secure the fundamental right to vote throughout the State of Florida should be left to the body we believe best equipped to study and address it, the Legislature.
Accordingly, pursuant to the direction of the United States Supreme Court, we hold appellants can be afforded no relief.
It is so ordered.
SHAW, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
*527 WELLS, C.J., concurs in result only with an opinion.
SHAW, J., concurs with an opinion.
HARDING, J., concurs in result only.
PARIENTE, J., concurs with an opinion.
WELLS, C.J., concurring in result only.
I concur only in the result which this Court decided in its order on remand in this case, which was that no relief could be granted and the case be dismissed.
SHAW, J., concurring.
This case has torn the nation and the judiciary. It is quintessentially divisive and confounding. The problem, I believe, lies not in the partisan nature of the issues but rather in the deeply rooted, and conflicting, legal principles that are involved.

A. The General Welfare

A fundamental principle underlying all legal proceedings is the search for the truth. Once the truth is uncovered, we assume that a remedy can be fashioned. The present case posed a simple question: Who won the presidential election in Florida? The answer, in the eyes of many, also was simple: The truth lies in the vaults and storage rooms throughout the state where the untabulated ballots of thousands of Floridians are sequestered.
A second deeply rooted principle is the right of suffrage. The right to vote, and to have each vote counted, is a preeminent civil right[2] and has been won at great cost. It was not too far in our nation's past that throngs of citizens marched in the streets to protest the suppression of this right and risked being beaten with nightsticks and set upon with tear gas, fire-hoses, and dogs. Some were jailed. A few-men, women, and childrenwere killed. The suppression of this right is now anathema to the nation. The right to vote, and to have each vote counted, goes to the very heart of this case.[3]
Both the search for the truth and the right to vote are of paramount importance, but they are circumscribed by a higher, overarching concernthe general welfare of our democracy. The general welfare is informed by our law.[4] The law infuses the fabric of our society and breathes life into all our legal principles. Inherent in the law are the basic concepts of fairness, reliability, and predictability; and the constitutional safeguards of due process and equal protection were designed to promote these interests. Although the pursuit of the truth and the preservation of the right to vote are worthy goals, they cannot be achieved in a manner that contravenes these principles.

B. The Recount Dilemma

A unanimous Florida Supreme Court in Palm Beach County Canvassing Board v. Harris, 772 So.2d 1220 (Fla.2000), applied traditional rules of statutory construction to resolve several conflicts and ambiguities in the Florida Election Code ("Code"). *528 The Court concluded that countywide manual recounts had been improperly cut off in the "protest" phase[5] by an advisory statement issued by the Florida Secretary of State, and we ordered that the counties must be given a commensurate window of opportunity in which to complete the manual recounts and submit supplemental returns. The United States Supreme Court vacated the judgment,[6] but this Court on remand reaffirmed our prior holding.[7]
In Gore v. Harris, 772 So.2d 1243 (Fla. 2000), a majority of the Florida Supreme Court authorized a manual recount of untabulated ballots in the "contest" phase.[8] To comport with due process and equal protection concerns, the Court ordered that the recount be conducted statewide and that the results be adjudicated by a single judge. I dissented because I felt that the recount, as formulated, lacked sufficient guidelines and could not be completed promptly and fairly. The United States Supreme Court on the first day of the recount, i.e., December 9, stayed the recount and at 10 p.m., December 12, ruled that additional guidelines were required. The Court further held that December 12 was a mandatory deadline under the Florida Election Code and that any recount extending beyond that date was violative of Florida law, thus foreclosing the possibility of a recount.[9]
First, in my opinion, December 12 was not a "drop-dead" date under Florida law. In fact, I question whether any date prior to January 6 is a drop-dead date under the Florida election scheme.[10] December *529 12 was simply a permissive "safe-harbor" date to which the states could aspire.[11] It certainly was not a mandatory contest deadline under the plain language of the Florida Election Code (i.e., it is not mentioned there) or this Court's prior rulings.[12] Second, regardless of the safe-harbor date, I am not convinced that additional safeguards could have been formulated that would have satisfied the United States Supreme Court. Given the tenor of the opinion in Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), I do not believe that the Florida Supreme Court could have crafted a remedy under these circumstances that would have met the due process, equal protection, and other concerns of the United States Supreme Court.[13]

C. Human Failings

Admittedly, the present scenario is surreal: All the king's horses and all the king's men could not get a few thousand ballots counted. The explanation, however, *530 is timeless. We are a nation of men and women and, although we aspire to lofty principles, our methods at times are imperfect.
First, although the untabulated Florida ballots may hold the truth to the presidential election, we stillto this daycannot agree on how to count those ballots fairly and accurately. In fact, we cannot even agree on if they should be counted. Second, although the right to vote is paramount, we routinely installed outdated and defective voting systems and tabulating equipment at our polls prior to the present election. And finally, although the rule of law is supreme, the key legal text in this casei.e., the Florida Election Code-is fraught with contradictions and ambiguities, and the key legal rulingi.e., the United States Supreme Court's final decision in Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)was denigrated and rejected by nearly half the members of that Court.

D. Conclusion

I commend the public officials, employees, and volunteers of this state-each election supervisor, judge, court clerk, board member, and all the others-who worked tirelessly in a star-crossed effort to count every vote. I commend the people of our state and nation who looked faithfully to the courts to interpret and apply the law. I also commend Vice President Gore for persevering in the labor of Sisyphus; each time he attempted to comply with the Code, he was forced to begin anew. And I commend President-elect Bush for remaining stalwart in the face of charges of suppressing the truth (i.e., of obstructing the counting of ballots) and disenfranchising the voters of this state. And finally, I especially commend the other justices of this Court, each of whom approached this case with a sworn resolve to be objective, honorable, and fair.
Our nation has been through an ordeal, but we have learned from the experience. At this point, I know one thing for certain: The basic principles of our democracy are intact.
PARIENTE, J., concurring.
I concur fully with the majority opinion. However, I write separately to discuss several concerns with Florida's present Election Code and the use of different voting systems in place in Florida's sixty-seven counties, particularly in light of the United States Supreme Court decision in Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Just as the lessons learned from the last major presidential election dispute-the election of 1876-prompted substantial reform, so my vision is that the valuable lessons we have learned from the 2000 presidential election will strengthen and reinvigorate our democracy.[14]
Whatever the reason, we now know that not every vote intended to be cast for a *531 candidate in this November 7, 2000, presidential election in Florida was tabulated and counted as a vote. Further, although manual recounts were completed in several counties,[15] in other counties the ballots for which the machine did not register a votethe "undervotes"were never examined manually to ensure that all legal votes were counted. What should concern all of us is not whether the uncounted votes were for President-Elect Bush or for Vice President Gore, but that thousands of voters in Florida did not have their vote included in this State's presidential election.
It is essential to our great democracy that all citizens have confidence in the integrity and reliability of the electoral process. As the Florida House of Representatives Committee on Election Reform 1997 Interim Project on Election Contests and Recounts expressly declared:
Recounts are an integral part of the election process. For one's vote, when cast, to be translated into a true message, that vote must be accurately counted, and if necessary, recounted. The moment an individual's vote becomes subject to error in the vote tabulation process, the easier it is for that vote to be diluted.
Id. at 15 (emphasis supplied) (footnotes omitted). As we have stated most forcefully, this Court remains committed to the principle that:
the real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interests to that of the people. Ours is a government of by and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard. We must tread carefully on that right or we risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right.
Boardman v. Esteva, 323 So.2d 259, 262-63 (Fla.1975) (emphasis supplied).[16] With these principles in mind, I turn to a review of some of the provisions of the Election Code and the voting systems in place at the time of the November 7, 2000, presidential election.
Statewide manual recounts: According to the official figures reported on November 8, 2000, the day after the election, out of almost six million votes cast in Florida, the difference between the vote totals for *532 the two candidates was a margin of only 1784 votes0.0299% of the total Florida vote. See Siegel v. Lepore, 234 F.3d 1163, 1168 (11th Cir. 2000). Because the margin of victory was less than "one-half of a percent ... of the votes cast," pursuant to Florida's Election Code, an automatic machine recount was conducted in each county in this State.[17] § 102.141(4), Fla. Stat. (2000). However, the Florida Election Code did not provide for an automatic procedure to allow for the option of one candidate to request a statewide manual recount according to uniform, "objective" standards.[18] Thus, one of the issues that should be considered in any future study of Florida's Election Code is whether such a procedure should have been in place.
Instead of a procedure for requesting a statewide manual recount, the statutes in place as of November 7, 2000, provided that a candidate had the option pursuant to section 102.166(4), Florida Statutes (2000), to request a manual recount from an individual county canvassing board. Based upon the express language in section 102.166, however, the individual county canvassing board is vested with discretion to conduct the initial manual recount of at least three precincts.[19] Once the initial sampling shows an "error in the vote tabulation which could affect the outcome of the election," the county canvassing board is required to exercise one of three options, with the third option being a manual recount of all ballots. § 102.166(5)(a)(c), Fla. Stat. (2000). In counting the ballots manually, the statute provides that if the "counting team is unable to determine a voter's intent in casting a ballot, that ballot shall be presented to the county canvassing board for it to determine the voter's intent." § 102.166(7)(b), Fla. Stat. (2000).
Although in a local or countywide election the discretion of whether to conduct a manual recount may be properly vested in an individual canvassing board, the discretionary nature of the decision raises concerns of uniformity and completeness in a statewide election. In a case where a manual recount is sought in several counties based on the identical assertion, as occurred in this presidential election, there are additional constitutional concerns raised if a manual recount is conducted and completed in some but not all the counties where the recount is requested.[20]
*533 This concern is demonstrated dramatically in this past election. On November 9, 2000, Vice President Gore requested manual recounts in four countiesMiami-Dade, Broward, Palm Beach and Volusia. See Gore v. Harris, 772 So.2d 1243, n. 16 (Fla.2000), rev'd and remanded, Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The reasons for this request included the extraordinary closeness of the statewide margin, as well as concern as to whether the vote totals reliably reflected the true will of the Florida voters. Of the four counties in which Vice President Gore requested a full manual recount, only the Miami-Dade Canvassing Board did not complete a manual recount. The Miami-Dade Board's failure to complete the recount was attributed to a variety of factors but in the end the Board suspended the full recount, stating as its reason that it determined that it could not meet this Court's certification deadline. See Gore v. Harris, 772 So.2d 1243, n. 17; see also Miami-Dade County Democratic Party v. Miami-Dade County Canvassing Board, 773 So.2d 1179 (Fla. 3d DCA 2000).[21] This Court ultimately held that the Miami-Dade Canvassing Board had no discretion to stop its full manual recount once it had started. See Gore v. Harris, 772 So.2d at 1257-1258. Nonetheless, the end result was that some voters in Miami-Dade County whose votes were not recorded by machine never had their votes counted in this election.[22] It would thus seem appropriate that any revised statutory scheme should include more specific standards to govern the exercise of county canvassing boards' discretionary authority in a statewide election.
Further, questions have been raised about the unequal treatment of voters in counties where recounts were not requested. Because section 102.166(4) provides that only a political party or a candidate may request a manual recount under section 102.166(4), there are additional issues regarding the potential for unequal treatment of voters in those counties in which a *534 manual recount is neither requested by the candidate nor conducted by the canvassing board. Because of our concerns that if some of the undervotes were to be counted in an election contest, all of the undervotes should be counted, we held in Gore v. Harris, 772 So.2d at 1261 that in fashioning relief under section 102.168(8), a manual recount should be conducted in all Florida counties where there was an undervote and where no manual recount had been conducted.[23] Our paramount interest was that the "election should be determined by a careful examination of the votes of Florida's citizens" so that the "outcome of elections be determined by the will of the voters," which "forms the foundation of the election code enacted by the Florida Legislature and has been consistently applied by this Court in resolving elections disputes." Id. at 1253. Thus, any comprehensive review of the Election Code should address both the scope of the manual recount statute, section 102.166, to allow for statewide manual recounts, and the scope of the contest statute, section 102.168, to fashion appropriate relief on a statewide basis.
In addition, the United States Supreme Court's decision in Bush v. Gore has also called into question the constitutionality of any statutory scheme that does not have more specific standards for evaluating votes when conducting manual recounts than the one currently codified by Florida law, which is whether the intent of the voter can be ascertained.[24]Bush v. Gore, 121 S.Ct. 525, 530-532. However, before the 2000 presidential election, neither the Legislature nor the Secretary of State had prescribed more explicit criteria to govern the determination of the voter's intent.[25] Although each county canvassing board may be properly vested with discretion to make this determination for a countywide race, the potential for differing substandards utilized by boards in different counties raises questions of unequal treatment among similarly situated voters in statewide races.[26]See id. at 530-531. This in turn requires an evaluation of whether there is a need for more specific standards, particularly in statewide elections, to be in place to ensure uniformity in the assessment of votes and in the determination of voters' intent when dealing with similar *535 voting systems.[27]
The Failure to Count Undervotes: Throughout this litigation, both the Secretary of State and President-Elect Bush asserted that the manual recount statute, section 102.166, was never intended to apply to allow for the counting of undervotes.[28] Florida's Election Code currently provides for a manual recount where there is an "error in the vote tabulation which could affect the outcome of the election." § 102.166(5). Utilizing traditional methods of statutory construction, we concluded in our decision in Palm Beach County Canvassing Board v. Harris, 772 So.2d at 1282, that "an error in vote tabulation" triggering a manual recount included the failure of a properly functioning machine to discern the choices of the voters as revealed by the ballots.
Further, in Gore v. Harris, we construed the term "legal vote" as used in the contest statute, section 102.168(3)(c), to be one where an examination of the ballot reveals a "clear indication of the intent of the voter." Gore v. Harris, 772 So.2d 1243 at 1254. In defining "legal vote," we looked to the Florida Election Code and once again applied traditional methods of statutory construction as amplified by our prior case law.[29] We found that both the statutes and this Court's jurisprudence have consistently paid homage to the principle that "every citizen's vote be counted whenever possible, whether in an election for a local commissioner or an election for President of the United States ." Id.
The position, however, has been espousedmost specifically by the Secretary of State in an advisory opinion issued after the November 7, 2000, electionthat the manual recount statute does not provide for the counting of undervotes.[30] Further, the Secretary of State has taken the position that a "legal vote" is only one where the vote is "properly executed in accordance with the instructions provided to all registered voters in advance of the election and in the polling places." Bush v. Gore, 121 S.Ct. 525, at 544 (Stevens, J., dissenting) (citing Brief of Respondent Harris et al. at p. 10).
In other words, according to the positions taken by the Secretary of State in this litigation, if a voter does not completely dislodge the chad or mark the optical scan card in strict accordance with the instructions, resulting in the machine not registering a vote, that vote should not constitute a "legal vote." Under the Secretary's interpretation of the manual recount statute and narrow definition of "legal vote," there would never be an opportunity to resort to a manual method of counting the undervotes under either the protest or contest provisions of Florida's Election Code. The implication of these dual positions would be that voters who cast votes that were incapable of being read by the machine would not be counted through a manual recount either pursuant to section 102.166 or section 102.168 even if upon a manual review the voter's *536 intent was clearly ascertainable.[31] In short, these votes would not be counted at all.
There are obviously important implications that flow from the Secretary of State's position that will affect elections long after this one. The Department of State is charged, among other responsibilities, with adopting rules to
achieve and maintain the maximum degree of correctness, impartiality, and efficiency of the procedures of voting, including write-in voting, and of counting, tabulating, and recording votes by voting systems used in this state.[32]
However, before the November 7, 2000, election, this State had a patchwork of different voting systems and ballots selected on a countywide basis and necessarily approved by the Secretary of State. If the Secretary's restrictive view of "legal votes" and manual recounts is ultimately adopted through amendments to the Election Code, there are potential constitutional implications, especially if the different voting systems continue to remain in operation. Simply put, the failure to allow for a manual recount would have a disparate effect on those counties that employed punchcard systems.[33]
As noted by the trial court in this case, Miami-Dade and Palm Beach Counties have been "aware ... for many years" of the problems with "voter error, and/or, less than total accuracy, in regard to the punchcard voting devices utilized." Gore v. Harris, 772 So.2d at 1258. As the United States Supreme Court noted in Bush v. Gore, 121 S.Ct. 525, at 529, "[t]his case has shown that punch card balloting machines can produce an unfortunate number of ballots which are not punched in a clean, complete way by the voter."
For a variety of reasons ranging from the voter's failure to precisely follow directions to difficulties with the machine itself, punchcard systems have a higher percentage of ballots that the machine *537 does not register as a vote as compared to the optical scanner system. Therefore, if the safeguard of a manual recount is not available to protect the integrity and reliability of the electoral process or if a "legal vote" is narrowly defined, voters in punchcard counties would be treated unequally as compared to voters in counties that utilize more reliable voting machinery, such as optical scanning technology.[34] Until there is modernization and uniformity of voting systems that will minimize the likelihood of a vote not being recorded and until punchcard systems are retired from use, statewide disparity in voting systems could operate to disenfranchise a number of otherwise eligible voters based upon their county of residency.[35] This disparity, based only on one's county of residence, might have constitutional implications.[36]
Conclusion: The realities of this past election have indeed "demonstrated the vulnerability of what we believe to be a bedrock principle of democracy: that every vote counts." Gore v. Harris, 772 So.2d at 1261 n. 20. I thus applaud Governor Jeb Bush's creation of a Task Force that will study the state's elections process and recommend improvements to "ensure the fairness of our system" and to fully modernize our voting and counting mechanisms.[37] As we enter the twenty-first century, we must strive to ensure that our Election Code and system of voting operates so that in all future elections, each eligible voter both has the opportunity to cast a vote and that every vote intended to be cast for a candidate will be counted.[38]
NOTES
[1] This opinion follows our dismissal of this cause by order of December 14, 2000.
[2] See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886) ("[The right of suffrage] is regarded as a fundamental political right, because preservative of all rights.").
[3] See generally Reynolds v. Sims, 377 U.S. 533, 561-62, 84 S.Ct. 1362, 1381-1382, 12 L.Ed.2d 506 (1964) ("[T]he right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.").
[4] The concern for the general welfare of our democracy is implicit in the United States Constitution, which provides in part:

We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.
U.S. Const. pmbl.
[5] See § 102.166, Fla.Stat. (2000).
[6] See Bush v. Palm Beach County Canvassing Bd., ___ U.S. ___, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000).
[7] See Palm Beach County Canvassing Bd. v. Harris, 772 So.2d 1273 (Fla.2000).
[8] See § 102.168, Fla.Stat. (2000).
[9] The United States Supreme Court ruled as follows:

Because it is evident that any recount seeking to meet the December 12 date will be unconstitutional for the reasons we have discussed, we reverse the judgment of the Supreme Court of Florida ordering a recount to proceed.
... Because the Florida Supreme Court has said that the Florida Legislature intended to obtain the safe-harbor benefits of 3 U.S.C. § 5, Justice Breyer's proposed remedy remanding to the Florida Supreme Court for its ordering of a constitutionally proper contest until December 18contemplates action in violation of the Florida election code, and hence could not be part of an "appropriate" order authorized by Fla.Stat. § 102.168(8) (2000).
Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525, at 533, 148 L.Ed.2d 388 (2000).
[10] Title III, section 15, United States Code, provides that regardless of prior dates, Florida is entitled to deliver its electoral votes to Congress prior to January 6 at which time Congress must count those votes unless Congress determines that the votes "have [not] been regularly given":

Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day.... [A]nd the votes having been ascertained and counted according to the rules in this subchapter provided, the result of the same shall be delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States.... [N]o electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected .... If more than one return of paper purporting to be a return from a State shall have been received by the President of the Senate, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed ... but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law; and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State.
3 U.S.C. § 15 (emphasis added).
[11] Title III, section 5, United States Code, provides that where a dispute concerning the appointment of electors is settled at least six days prior to the date set for the meeting of electors (i.e., at least six days prior to December 18, 2000), the state's decision concerning the settlement is conclusive:

If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such state, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.
3 U.S.C. § 5 (emphasis added).
[12] Contrary to the ruling of the United States Supreme Court in Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), our prior opinions discussed Title III vis-a-vis the Florida Secretary of State's authority to reject late returns arising from a pre-certification protest action, not vis-a-vis a court's obligation to stop a recount in a post-certification contest action. See Palm Beach County Canvassing Bd. v. Harris, 772 So.2d 1220 (Fla. 2000), and Palm Beach County Canvassing Bd. v. Harris, 772 So.2d 1273 (Fla.2000). To mix these two actions is to confuse apples and oranges.
[13] The United States Supreme Court summarized the constitutional requirements for a recount:

[I]t is obvious that the recount cannot be conducted in compliance with the requirements of equal protection and due process without substantial additional work. It would require not only the adoption (after opportunity for argument) of adequate statewide standards for determining what is a legal vote, and practicable procedures to implement them, but also orderly judicial review of any disputed matters that might arise.
Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525 at 532, 148 L.Ed.2d 388 (2000). The Court then adopted the position of the Florida Secretary of State concerning untabulated ballots:
In addition, the Secretary of State has advised that the recount of only a portion of the ballots requires that the vote tabulation equipment be used to screen out undervotes, a function for which the machines were not designed. If a recount of overvotes were also required, perhaps even a second screening would be necessary.
Bush, at 532. And finally, the Court construed Florida law to give the Secretary a decisive evaluative role:
Use of the equipment for this purpose, and any new software developed for it, would have to be evaluated for accuracy by the Secretary of State, as required by Fla.Stat. § 101.015 (2000).
Bush, at 532-533.
[14] In modern times, we have never experienced a post-election court dispute in the election for the President of the United States. The time limits Congress enacted for resolving contests in Presidential elections were established in a far different time, when our country looked far differentand was far less populous than today. Indeed, Congress enacted the safe harbor provision, 3 U.S.C. section 5, and other election-related dates, in 1887, as a result of the Hayes Tilden postelection dispute. See Bush v. Gore, ___ U.S. ___, 121 S.Ct. 525 at 555, 148 L.Ed.2d 388 (2000) (Breyer, J., dissenting). The significance of these time limits is not entirely clear. See id. at 550 (Ginsburg, J., dissenting) (explaining that "the December 12 `deadline' for bringing Florida's electoral votes into 3 U.S.C. § 5's safe harbor lacks the significance the Court assigns it.... [N]one of these dates has ultimate significance in light of Congress' detailed provisions for determining on `the sixth day of January,' the validity of electoral votes. § 15"). Accordingly, although we have become a society accustomed to immediate resultscommunications delivered via fax with rapid speed and news stories broadcast over the Internet as they occurperhaps the time has come for Congress to explore whether, in the rare case of a postelection presidential controversy, a thirty-five day time limit for a final resolution of a presidential contest is realistic or reasonable.
[15] Full hand counts were done at the request of the Florida Democratic Executive Committee ("Committee") in Volusia, Broward, and Palm Beach Counties. See Palm Beach County Canvassing Board v. Harris, 772 So.2d 1273, 1279 (Fla.2000).
[16] John Greenleaf Whittier's nineteenth century poem, "The Poor Voter on Election Day," more eloquently echoes the importance of this fundamental right to vote as the great equalizer between all citizens:

To-day, of all the weary year, A king of men am I. To-day, alike are great and small, The nameless and the known; My palace is the people's hall, The ballot-box my throne! The rich is level with the poor, The weak is strong to-day; And sleekest broadcloth counts no more Than homespun frock of gray. To-day let pomp and vain pretence My stubborn right abide; I set a plain man's common sense Against the pedant's pride. The wide world has not wealth to buy The power in my right hand!
[17] Although there were assertions made that the votes were counted and recounted, apparently in some counties the votes were not even subjected to a second machine count only the machines were checked. See Phil Long & Dan deVise, Not All Florida Counties Obeyed Order To Do Recount, Miami Herald, December 15, 2000. Further, the automatic machine recount in Nassau County actually showed fewer overall votes than the initial machine count. See Gore, 772 So.2d 1243, at 1248. The fact that the two machine counties showed differing vote totals should raise concerns about the reliability of machine counts in close elections. This disparity shows yet one more reason why "our society has not yet gone so far as to place blind faith in machines." Palm Beach Canvassing Board, 772 So.2d 1273, at 1284.
[18] At oral argument on November 20, 2000, "we inquired as to whether the presidential candidates were interested in our consideration of a reopening of the opportunity to request manual recounts in all counties. Neither candidate requested such an opportunity." Palm Beach Canvassing Bd., 772 So.2d 1273, at 1290 n. 21 (Fla.2000).
[19] The current statute does not set forth any criteria to guide the determination of when the decision to conduct a preliminary manual recount is appropriate. See § 102.166(4)(c), Fla.Stat. (2000) ("The county canvassing board may authorize a manual recount.").
[20] If manual recounts are requested by a candidate in several counties, and one board conducts a full manual recount and another board does not, then, as the Attorney General noted in his November 14, 2000, opinion letter to the Honorable Charles E. Burton, Chair, Palm Beach County Canvassing Board, an unconstitutional two-tiered system may have been created:

If hand recounts have already occurred in Seminole County and an unknown number of other counties ... while similar hand counts are blocked in other counties ... a two-tier system for reporting votes results.
A two-tier system would have the effect of treating voters differently, depending upon what county they voted in. A voter in a county where a manual recount was conducted would benefit from having a better chance of having his or her vote actually counted than a voter in a county where a hand count was halted.
As the State's chief legal officer, I feel a duty to warn that if the final certified total for balloting in the State of Florida includes figures generated from this two-tier system of differing behavior by official canvassing boards, the state will incur a legal jeopardy, under both the U.S. and State constitutions. This legal jeopardy could potentially lead to Florida having all of its votes, in effect, disqualified and this state being barred from the Electoral College's selection of a President.
(Emphasis supplied.) It should be noted that the Attorney General's opinion did not address constitutional concerns of manual recounts not being conducted in all counties, but rather specifically addressed constitutional implications if one county canvassing board refused to conduct a manual recount requested by a candidate while other county canvassing boards agreed to conduct a manual recount.
[21] Miami-Dade did not commence the full manual recount until days after Broward and Palm Beach Counties commenced their manual recounts. In fact, the Miami-Dade Canvassing Board had initially decided not to conduct a full manual recount after receiving the results obtained from the sample recount of three precincts. See Gore, 772 So.2d 1243, at 1258.
[22] When the Miami-Dade Canvassing Board stopped the recount, approximately 20% of the votes had been manually recounted countywide, resulting in 168 net votes for Gore. However, at least 9000 undervotes were never counted. See Gore v. Harris, at 1258. Further, Palm Beach County did not finish its recount until after 5 p.m. on November 26, 2000, and the Secretary did not include the amended results in the statewide certification. See id. at 1260. There have been those that have argued that any manual recount under the Election Code must be completed within seven days of the election. However, as we have seen, that is simply not a realistic time period and operates to the detriment of voters in the more populous counties. This problem, in itself, could raise implications of disparate treatment based solely on the voter's county of residence.
[23] I remain confident that if the recount had continued in a timely manner, any obvious disparity in counting votes would have been reviewed by Judge Terry Lewis whose initial order on December 8, 2000, demonstrated an orderly and objective approach to the recount procedures.
[24] See Bush, 121 S.Ct. 525, at 537, n. 2 (Stevens, J. dissenting), in which Justice Stevens noted that the "Florida statutory standard is consistent with the practice of the majority of States, which apply either an "intent of the voter" standard or an "impossible to determine the elector's choice" standard in ballot recounts." Id.
[25] Neither candidate raised the constitutionality of Florida's election laws as an issue on appeal to this Court. See Palm Beach County Canvassing Board v. Harris, 772 So.2d 1273 n. 7 (Fla.2000). Instead, President Elect Bush chose to bring a separate challenge to the constitutionality of section 102.166 in federal court. See Siegel v. LePore, 120 F.Supp.2d 1041 (S.D.Fla.) (denying a request for a preliminary injunction to stop the recount), aff'd, 234 F.3d 1163 (11th Cir. 2000).
[26] For example, although much of the focus has been on the potential disparity in counting votes in punchcard counties, it appears the potential for disparity could exist in counties utilizing optical scanning machines when one county adopts a per se rule and another employs a totality of the circumstances approach to evaluate voter intent. See Jeff Kunerth, Scott Maxwell & Maya Bell, Voter Never Had Chance, Orlando Sentinel, December 17, 2000 (explaining that in Lake County, the canvassing board decided against counting votes of residents who filled in the circle next to a candidate's name but who also wrote in the same name on the ballot; whereas in Orange County, canvassing officials counted such votes, stating that intent was clear). If a manual recount would have been undertaken in any county using a per se rule, there could be a real potential that legal votes would not have been counted. This potential demonstrates the pitfalls of any per se rule, even while this past election raised concerns about the application of a totality of the circumstances approach to determine voters' intent when employed on a county-to-county basis.
[27] The statutory scheme that stresses local autonomy results from the present administration of all elections in Florida, which includes statewide and local controls. Although the Secretary of State is the chief election officer of the state, see section 97.102(1), Florida Statutes (2000), the actual conduct of elections occurs in Florida counties with the county canvassing boards in each county responsible for counting the votes given each county. See § 102.131(1), § 102.141(2), Fla.Stat. (2000).
[28] Initially, their position in this Court had been that any attack on the problems with punchcard ballots and the increased percentage of undervotes should not be raised under the protest provisions of section 102.166(4), but in the contest provisions of section 102.168. But see Gore v. Harris, 772 So.2d 1243 at 1249 n. 7 (noting parties' change of position that section 102.168 does not apply to a presidential election).
[29] See, e.g., State ex rel. Carpenter v. Barber, 144 Fla. 159, 163-64, 198 So. 49, 50-51 (1940); Wiggins v. State ex rel. Drane, 106 Fla. 793, 795-97, 144 So. 62, 63 (1932).
[30] See Division of Elections Advisory Opinion, DE 00-13, November 13, 2000.
[31] In fact, the Texas statute, as well as the statutes in many other states, clearly anticipates that in a manual recount all punchcard ballots would be reviewed even where the chad is not completely detached, with the overarching concern being the "clearly ascertainable intent of the voter." The Texas statute provides in pertinent part:

(d) Subject to Subsection (e), in any manual count conducted under this code, a vote on a ballot on which a voter indicates a vote by punching a hole in the ballot may not be counted unless:
(1) at least two corners of the chad are detached;
(2) light is visible through the hole;
(3) an indentation on the chad from the stylus or other object is present and indicates a clearly ascertainable intent of the voter to vote; or
(4) the chad reflects by other means a clearly ascertainable intent of the voter to vote.
(e) Subsection (d) does not supersede any clearly ascertainable intent of the voter.
Tex.Elec.Code Ann. § 127.130 (Vernon Supp. 2001).
[32] Further, pursuant to section 101.015(2), "each odd-numbered year the Department of State shall review the rules governing standards and certification of voting systems to determine the adequacy and effectiveness of such rules in assuring that elections are fair and impartial."
[33] As Justice Stevens points out, carried to its logical conclusion "Florida's decision to leave to each county the determination of what balloting system to employdespite enormous differences in accuracymight run afoul of equal protection." Bush, 121 S.Ct. 525, at 541 (Stevens, J., dissenting) (emphasis supplied). Justice Stevens notes that "[t]he percentage of nonvotes in counties using a punch-card system was 3.92%; in contrast, the rate of error under the more modern optical-scan system was only 1.43%. Put in other terms, for every 10,000 votes cast, punch-card systems result in 250 more nonvotes than optical-scan systems." Id. at 541, n. 4 (citations omitted). In fact, in the 1996 presidential election, in Brevard County and Volusia County, votes tallied on punch cards showed twenty-six of every 1000 voters failed to cast a valid presidential vote. In 2000, after both counties switched to optical scanning, the proportion fell to fewer than two of every 1000 presidential votes in Brevard County and three of every 1000 in Volusia County. See Peter Whoriskey & Joseph Tanfani, Punch Card Problems Were Ignored for Years, Miami Herald, December 17, 2000.
[34] As reported, prior studies have shown various problems with the punchcard system and the fact that it has a higher failure rate than more modern systems. In fact, a 1988 National Bureau of Standards report recommended their elimination. See Peter Whoriskey & Joseph Tanfani, Punch Card Problems Were Ignored for Years, Miami Herald, December 17, 2000; Brooks Jackson, Punch Card-Ballots Notorious for Inaccuracies, http://www.cnn.com/2000/ALLPOLITICS/stories//1115/ jackson.punchcards/index.html; see also Rafeal Lorente, '96 Analysis: Minority Votes for President More Likely to Go Uncounted, Sun Sentinel, December 7, 2000 (explaining that in 1996, twenty-six out of every 1000 votes cast using the punchcard system were disqualified, versus only seventeen of every 1000 votes using the optical scanning system); Scott Maxwell, Palm Beach Has Had Trouble Before, Orlando Sentinel, December 5, 2000 (explaining that Palm Beach County's elections supervisor reported in 1996 that faulty voting machines led to an unusually high number of ballots for which there was no vote for President).
[35] It does appear that a significant part of the problems have resulted from the outmoded voting systems in place in many counties in this State and nationwide. This is in contrast with what appears to be the use in other countries of more modern, uniform and efficient methods of making sure that every vote is counted. See Mary McGrory, Just Fine Without a Chad, Washington Post, December 10, 2000, at B1 (describing the voting systems in Mexico, Canada and India); Stephen Buckley, Brazilians' Pride Grows in Electronic Voting System, Washington Post, December 2, 2000, at A18 (explaining Brazil's electronic voting system, which includes the use of a machine that looks like a miniature ATM).
[36] See Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1(1969) (invalidating a county-based procedure that diluted the influence of citizens in larger counties in the nominating process).
[37] See Jeb Bush Appoints Task Force to Recommend Improvements in the Way Florida Votes, CNN.com (Dec. 14, 2000), http://www.cnn.com/2000/ALLPOLITICS/stories/12/14/fla. elections/. As Governor Jeb Bush recently stated: "Real electoral reform is not only updating our technology and clarifying our standards. It also means reaffirming our commitment to making sure every citizen has faith and confidence in our electoral systemeven when the margin of victory in a race is very close." Mary Ellen Klas, Panel to Ensure Vote Debacle Won't Recur, The Palm Beach Post (Dec. 15, 2000), http:// www. gopbi.com/partners/pbpost/epaper/editions/ today/news 3.html.
[38] Although much of the discussion herein has been focused upon problems with the present election code and the actual voting systems, it is clear that the subject of election and voting reform will be far broader. Issues ranging from the difficulty with the actual form of the ballot in certain counties to concerns with the practices surrounding the casting of absentee ballots, and even concerns over whether voters were denied access to the polls, have opened our collective eyes to see that meaningful and comprehensive reform in many areas may be required.